**B. Frank THOMAS, Appellant,**

**v.**

**J.D. COX, Warden, Appellee.**

**No. 82–6614.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided June 1, 1983.

Certiorari Denied Oct. 17, 1983.

See 104 S.Ct. 284.

Irving M. Blank, Richmond, Va. (Paul, Smith & Blank, Richmond, Va., on brief), for appellant.

Jerry P. Slonaker, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Va., Richmond, Va., on brief), for appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

This appeal presents the question whether incriminating statements made by a pretrial prison detainee to a fellow prison inmate who had initiated contacts with the police and been advised by them to listen for but not elicit information were unconstitutionally admitted in the detainee's state criminal trial in violation of his sixth amendment rights to counsel as defined in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The district court denied a petition for federal habeas corpus based upon the sixth amendment claim. We agree with the district court that the facts of this case are distinguishable in critical respects from those in *Henry* and that they lie beyond the sixth amendment protections defined and applied in that case. Accordingly, we affirm.

## I

On June 2, 1979, Thomas was arrested and charged with the murder of his girlfriend's mother, Rosa Annette Stout, who during the preceding evening had been strangled with a shoelace and run over with a car. Thomas was incarcerated in the Goochland County Jail, where he became acquainted in late August with Charles Gregory, who was serving a three-year sentence, with two years and three months suspended, for auto theft. During the following several weeks, Thomas made a series of statements, some in response to questions posed by Gregory and others in the course of general conversation, that incriminated him in the murder of Mrs. Stout. For example, when Gregory observed that he had heard that the victim of the crime for which Thomas had been charged had been strangled, raped and run over with a car, Thomas replied, "I did not rape her."

In early or mid-November, when Gregory was in court on a sentencing matter, he encountered Leslie Parrish, an investigator for the sheriff's office. When Gregory asked about the disposition of Thomas's case, Parrish informed Gregory that the Thomas trial had been postponed. Gregory observed, "I know he's guilty . . . just from the things he's said," and then related several of Thomas's earlier, self-incriminating statements. Both Gregory and Parrish later testified that Gregory did not agree to furnish the Commonwealth with additional information, and Gregory further testified that he declined Parrish's invitation to talk to the Commonwealth's Attorney.

Approximately a week later, when Gregory again was required to appear in court on his own behalf, he met with Thomas Snead, a state police investigator who had been informed by Parrish that Gregory possessed information helpful to the Commonwealth's case against Thomas. At this meeting, Gregory showed Snead a single sheet of paper on which Gregory had handwritten a list of Thomas's damaging admissions. Snead testified that he

> instructed [Gregory] not to go back to the jail and ask any questions, but if [Gregory] did hear of anything else to let [him] know . . . . But specifically [Gregory] was instructed . . . not to ask [Thomas] any questions . . . but to be alert to anything [Thomas] might say.

Snead further testified that he told Gregory that no promises could be made for his help, that Gregory was neither offered, nor asked for, anything from Snead, and that the gist of the conversation was "if you [Gregory] want to give us the information that's fine, if not, that's fine."

When Gregory returned to the Goochland jail, he again had the opportunity to converse with the petitioner, who made over twelve additional self-incriminating statements to Gregory. Included in this series of statements to Gregory were several direct admissions of guilt. Illustrative of the nature of petitioner's statements are two replies to observations made by Gregory: "Yeah, I killed her and I bet I will get off scott free [sic]," and "I killed somebody and I ain't carrying any dead woman on my back." Gregory continued recording Thom-

as's comments on scraps of paper until he was released on parole in December of 1980.

At Thomas's trial, the Commonwealth sought to have Gregory testify as to the approximately 25 self-incriminating statements made by Thomas. The state trial judge held a hearing to determine if the Commonwealth had, through Gregory, elicited the damaging evidence from Thomas in violation of his sixth amendment right to counsel, as that protection had been interpreted by this court in *Henry v. United States.*[1] At this hearing Gregory explained that his motivation for collecting information from Thomas, as well as from other prisoners, was curiosity, and that he did not decide until three days after his release from prison to cooperate with the Commonwealth. Officers Snead and Parrish corroborated Thomas's testimony, and the trial judge found that Gregory was "a self-initiated informant, moved by conscious [sic]," that he was not a "government agent," and that the Commonwealth had therefore not violated the principle established in *Henry.*

Gregory then testified before the jury, which found Thomas guilty of the first degree murder of Rosa Annette Stout on February 18, 1980. Arguing that the Commonwealth had unconstitutionally interfered with his right to counsel, Thomas appealed his conviction to the Virginia Supreme Court, which dismissed his Petition for Appeal.

Thomas then sought federal habeas corpus relief under 28 U.S.C. § 2254. The district court denied the relief on the basis that the Commonwealth's actions did not run afoul of the principle announced in *Henry,* because Gregory was not under the control of the Commonwealth and had made no agreement to cooperate with them in their investigation or prosecution of Thomas. Moreover, the court found as fact—against petitioner's allegation—that the Commonwealth had not placed Gregory near Thomas in the Goochland jail and concluded from all this that no agent of the Commonwealth had "set a scheme in motion" to deprive Thomas of his right to counsel. This appeal followed.

## II

In *Henry,* the Court held that the government violated an incarcerated defendant's right to counsel by intentionally placing a paid, undercover government informant in close proximity to the defendant and instructing the informant "not to initiate" any conversations with the defendant but "to be alert" to any statements he might make regarding the crime for which he was charged. In holding that the government had "deliberately elicited" incriminating statements from the defendant in violation of the proscription of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Court relied on three factors: that the inmate witness was a paid informant acting on instructions from the government, that the informant was ostensibly no more than a fellow inmate of the defendant, and that the defendant was in custody and under indictment at the time he incriminated himself. *Henry,* 447 U.S. at 270, 100 S.Ct. at 2186.

The petitioner argues that the same considerations that guided the Supreme Court's decision in *Henry,* except for the fact that Gregory was an unpaid informant while the inmate witness in *Henry* worked for a fee, are present in this case as well. Indeed, as the Commonwealth concedes, the similarities between the two cases are quite close and readily apparent. Like the inmate witness in *Henry,* Gregory gathered much of his information after having received practically identical "instructions" from the government, and appeared to be no more than a fellow inmate of the defendant who, at the time he incriminated himself, was in custody and under indictment. And we agree with petitioner that whether the Commonwealth violated Thomas's right to counsel cannot, on this record, turn solely on the fact that Gregory was

---

1. The trial judge had available to him only our opinion in *Henry v. United States,* 590 F.2d 544 (4th Cir.1978), before its affirmance in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

not *monetarily* rewarded for his efforts. *See United States v. Sampol,* 636 F.2d 621, 638 (D.C.Cir.1980) (reward of staying free on probation).

But there are also critical differences in the two situations. They relate essentially to the nature of the relationship between the state and the inmate witness, hence to the question whether the actions of the inmate witnesses in the two cases can properly be attributed to the state.[2]

In *Henry,* the Court considered it critical that the informant, previously in the government's paid employ in similar missions, was specifically contacted by the government and given his charge respecting the procurement of possibly incriminating information from Henry. Also important to the *Henry* Court was the fact that the informant's mission was on a "contingent-fee" basis, *Henry,* 447 U.S. at 270, 100 S.Ct. at 2187, thereby demonstrating a formal "prearrangement," *id.* at 273, 100 S.Ct. at 2188, between state and informant (as well as encouraging an active rather than merely passive role for the latter in eliciting inculpatory information). From these circumstances the Court in *Henry* was able to characterize the informant as a "Government agent expressly commissioned to se-cure evidence," *id.* at 273, 100 S.Ct. at 2188, from the accused.

By contrast, as determined by the state trial judge, whose factual findings are entitled to a presumption of correctness when, as here, none of the enumerated exceptions to 28 U.S.C. § 2254(d) exists, *see Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982), the inmate witness Gregory in the present case was a "self-initiated informant" who was "motivated by conscience" in initiating the contact and carrying through his proffer of assistance. And the district court further determined, looking solely to the state court record,[3] that Gregory was at no time subject to the control of the Commonwealth, had made no prior "arrangement" with the Commonwealth to procure information from or testify against the accused, and had "nothing to gain" from his actions vis-a-vis the accused, having been promised no reward, nor having any reason created by the Commonwealth to anticipate any. *Cf. United States v. Sampol,* 636 F.2d 621 (D.C. Cir.1980) (continued freedom on probation contingent upon service as informant). Indeed, it is apparently not disputed that, as Gregory testified, he in fact served his entire sentence for auto theft.[4]

**2.** In none of the three principal decisions of the Supreme Court that define the reach of sixth amendment protections against government's "deliberate elicitation" of incriminating evidence from accused persons unaccompanied by counsel—*Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); and *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)—has the "agency" of the person directly eliciting the evidence been the focal point of inquiry. But in each the necessity of such a relationship has been assumed. In *Massiah,* the direct eliciter was a "turncoat codefendant" under the immediate control of a federal officer, *see Henry,* 447 U.S. at 279, 100 S.Ct. at 2191 (Blackmun, J., dissenting), and *de facto* "agency" of the private citizen in those circumstances was simply assumed. In *Brewer,* the direct "eliciter" was a police officer, an official "agent." Only in *Henry* was the "agency" of the direct eliciter—a private citizen as in *Massiah*—potentially an arguable question. The *Henry* Court considered the matter of sufficient moment to require attention, but essen-tially assumed the existence of agency from the undisputed facts of prior employment on similar missions and a specific fee "arrangement" for the mission at hand. *See Henry,* 447 U.S. at 270, 100 S.Ct. at 2187.

**3.** The district court's factual findings derive ample support from the state court record and are therefore neither erroneous under our independent reading of the record, *see Taylor v. Lombard,* 606 F.2d 371, 372 (2d Cir.1979), nor clearly erroneous under Fed.R.Civ.P. 52(a). *See also Spry v. Boles,* 299 F.2d 332, 334 (4th Cir.1962).

**4.** Although the relevant inquiry is whether Gregory was an agent of the Commonwealth at the time of his post-encounter conversations with Thomas, *see United States v. Malik,* 680 F.2d 1162, 1164-65 (7th Cir.1982); *United States v. Calder,* 641 F.2d 76, 79 (2d Cir.) *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), the fact that he received no reward in the form of a reduced sentence supports the conclusion that at the critical time he was on no sort of *quid pro quo* basis with the Com-

So far as this record discloses, for whatever reason Gregory acted—whether "conscience," as the state court found, or "curiosity," as he testified, or even conceivably from an unencouraged hope to curry favor, *see United States v. Malik,* 680 F.2d 1162, 1164–65 (7th Cir.1982)—he could not properly be characterized, as could the informant in *Henry,* as "a Government agent expressly commissioned to secure evidence." *Henry,* 447 U.S. at 273, 100 S.Ct. at 2188. For this reason we do not believe that—as both this court and the Supreme Court could and did conclude in the *Henry* situation—the conduct of this inmate witness in procuring evidence is fairly "attributable to the Government." *Id.* at 270, 100 S.Ct. at 2187.

For sixth amendment protections to be violated through "surreptitious interrogations," *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), of accused persons by private citizen informers, there must have been a "deliberate[ ] elicit[ation]" of evidence by government through the medium of the informer, *id.* Whether there may ever be "deliberate elicitation" on the part of government when its informer, though "planted," is wholly passive, is a question now expressly left open by the Supreme Court, *see Henry,* 447 U.S. at 271 n. 9, 100 S.Ct. at 2187 n. 9.[5] But where the citizen himself actively, though surreptitiously, elicits disclosures, the only question is whether at the critical time he was also a creature—an agent[6]—of the state. If so, his deliberate elicitation of evidence is necessarily attributable to the state as would be that of a state official.

The point at which agency—hence proper attribution—for this purpose arises out of a government-citizen relationship is not subject to any bright-line test. But we think a general benchmark can be derived from *Henry,* where the agency question did figure in the Court's factual analysis. *See supra* note 2. *See also United States v. Malik,* 680 F.2d 1162 (7th Cir.1982); *United*

monwealth. *See United States v. Surridge,* 687 F.2d 250, 254 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982).

**5.** Principal points of difference between the majority, the concurring, and the two dissenting positions in the Supreme Court's *Henry* decision precisely concern the proper application of *Massiah*'s "deliberate elicitation" standard in the planted inmate informer context. Specifically, the main point of division would seem to be on the necessity that the informer be an active, though surreptitious, interrogator as opposed to a merely passive listening-post. The *Henry* majority was persuaded that on the facts of record, sufficiently active direct elicitation was involved to make it unnecessary to decide whether "deliberate" governmental use of a passive human or mechanical "listener" could ever constitute "deliberate elicitation." *See Henry,* 447 U.S. at 271–74, 100 S.Ct. at 2187–88 (emphasizing that "conversations" and not mere passive listening took place; that conversation was "stimulated" by prison context and susceptibility of inmates to "ploys of undercover . . . agents"). Justice Powell, concurring, was concerned that the holding be expressly limited to such instances of active elicitation, and opined that neither the use of passive listening devices nor of passive human informers could constitute "deliberate elicitation" by Government. *See id.* at 276, 100 S.Ct. at 2191 (Powell, J., concurring). Justice Blackmun, dissenting, thought that "deliberate elicitation" in this context could only apply to ac-

tions of government officials "undertaken with the specific intent to evoke an inculpatory disclosure." *Id.* at 278, 100 S.Ct. at 2189 (Blackmun, J., dissenting). On the facts of the case, principally that the police officer who "instructed" the informer expressly directed that he not actively elicit information, Justice Blackmun thought the *Massiah* standard of deliberate elicitation had not been met. Justice Rehnquist, dissenting, thought first that *Massiah* should no longer in general be applied to this general form of surreptitious interrogation. Beyond this, he thought the facts did not support a finding of deliberate elicitation under *Massiah,* properly interpreted. In particular, the mere initiation of conversation by a fellow inmate should not constitute the "deliberate elicitation" of any incriminatory disclosures that ensue. *Id.* at 302, 100 S.Ct. at 2203 (Rehnquist, J., dissenting).

**6.** Agency for this purpose may more easily be found where the informer's assigned (or assumed) mission is specifically targeted upon the accused. *See Henry,* 447 U.S. at 270–71 & n. 8, 100 S.Ct. at 2186–87 & n. 8. *Cf. United States v. Sampol,* 636 F.2d 621, 638 (D.C.Cir. 1980) (government "trolled in the jail, using [the informant] as bait, and was ready to net any unwary inmate who rose to the lure").

Gregory's "instructions" in the instant case were, of course, targeted upon Thomas.

*States v. Van Scoy,* 654 F.2d 257 (3d Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981).

As we read *Henry,* the relationship between state and informer in that case must approach or reach the outer limits of the relationship required to "attribute" to the state the private citizen's conduct as "surreptitious interrogator." *See Henry,* 447 U.S. at 270, 100 S.Ct. at 2187 (inmate witness acting "under instructions as a paid informant"). Certainly well beyond those limits must be the myriad situations in which a casual prior encounter—by whomever initiated—between prison inmate and state official results in a simple admonition by the latter, with no express or implicit *quid pro quo* undergirding it, to "keep your ears" open or "listen but don't ask" or the like. We need not attempt to define exactly where on the spectrum of situations the actual limits of sixth amendment protections lie to hold narrowly, as we do, that the relationship here lies much nearer the latter pattern, and beyond the limits generally implied in *Henry.*

We decline to find in the inmate-police encounter here the requisite degree of "prearrangement" or "ongoing cooperation" between state and witness required to implicate the state and thereby to invoke sixth amendment protections. *See United States v. Calder,* 641 F.2d 76, 78–79 (2d Cir.), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). To do so would be in practical effect to establish the principle that any voluntary proffer of inmate informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures arguably induced by the circumstances of confinement that are subsequently made by an accused in conversations with the inmate. *See Henry,* 447 U.S. at 273–74, 100 S.Ct. at 2188. We do not believe that *Henry* implied this, nor that the sixth amendment's protection of the right to ef-

fective assistance of counsel was intended to reach so far.[7]

AFFIRMED.

---

7. In view of our disposition, we do not reach the related questions of whether the district court's finding that Gregory obtained the bulk of his evidence before he talked with the police is erroneous, or whether admission of the evidence was in any event harmless constitutional error.