**The STATE of Texas, Appellant,**

**v.**

**Henry David HERNANDEZ, Appellee.**

**No. 04–91–00039–CR.**

Court of Appeals of Texas,
San Antonio.

Aug. 31, 1992.

Rehearing Denied Oct. 20, 1992.

Discretionary Review Refused
Feb. 3, 1993.

---

**3.** *See also White v. Illinois,* — U.S. —, 112 S.Ct. 736, 747, 116 L.Ed.2d 848 (1992) (Thomas, J., concurring in part, concurring in judgment).

Mark Stevens, San Antonio, for appellant.

Steven C. Hilbig, Crim. Dist. Atty., Beth Taylor, Sam Ponder, Barbara Hervey, Asst. Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, CHAPA and ONION, JJ.

## OPINION

ONION, Justice (Assigned).[1]

### A State's Appeal

The State appeals an order of the trial court granting a motion to suppress appellee's oral statements made to a television news reporter over the telephone while appellant was incarcerated in the county jail. *See* TEX.CODE CRIM.PROC.ANN. art. 44.01(a) (Vernon Supp.1992).

Appellee is charged by indictment with the offense of capital murder. Appellee filed a pretrial motion to suppress certain oral statements made by him, contending that the same are inadmissible as they were obtained in violation of his federal and state constitutional rights and Texas statutory provisions. At the conclusion of the suppression hearing, the trial court ordered that the oral statements of the appel-

lee made to a television news reporter and the taped recording of that conversation be suppressed. The trial court specifically based its findings on a violation of the Sixth Amendment right to counsel alone. It further found that the taped recording had been altered and did not meet the requirements of *Edwards v. State*, 551 S.W.2d 731 (Tex.Crim.App.1977). The State agrees that the tape is inadmissible. It, however utilizes its limited right of appeal, urging in a single point of error, that the trial court erred in granting the motion to suppress the oral statements made to the news reporter on the basis of the Sixth Amendment.

### The Suppression Hearing

The suppression hearing developed a scenario in which the appellant, Henry David Hernandez, and Brian Karem, the television news reporter, were the principal actors. Chief Deputy Sheriff Alex Ramirez, jail runner Charles Reid, and Joe L. Hernandez, appellee's attorney, assumed supporting roles. The sheriff and others were bit players.

Many of the basic facts are undisputed. San Antonio Police Officer Gary Lee Williams was shot and killed in the early morning hours of March 27, 1989. Later the same day, felony complaints charging murder were filed in a Justice of the Peace Court against the appellee and his brother, Julian Hernandez. Arrest warrants were issued and an intensive manhunt was launched. On March 29, 1989, attorney Joe L. Hernandez, who had represented appellee on other matters for several years, arranged for the appellee and his brother to surrender to members of the district attorney's office. They were first taken to the office of the district attorney, and then brought before District Judge James E. Barlow, who performed the function of a magistrate under TEX.CODE CRIM.PROC.ANN. art. 15.17 (Vernon Supp.1992). Judge Barlow informed the appellee and his brother of the charges filed against them, gave the

---

**1.** Presiding Judge, Retired, Court of Criminal Appeals, assigned to this case pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

proper warnings (equivalent to the *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) warnings), and determined that appellee and his brother desired the appointment of counsel. The judge had them fill out the necessary papers and announced that he would appoint counsel for them. Attorney Hernandez informed the magistrate that he would remain in the case to assist appointed counsel. Attorney Hernandez then requested that the magistrate order that appellee and his brother not be interviewed by the police without the presence of counsel. The record does not reflect any ruling or response to the request. The two men were then remanded to jail to be held without bail. Sometime during these described activities, attorney Hernandez declined a request from San Antonio Police Officer James Holguin for an interview with his clients.

Attorney Hernandez testified that he went to the county jail after the hearing before the magistrate. He related that the sheriff and his chief deputy agreed with his request that the police were to have no access to the Hernandez brothers. The sheriff and Chief Deputy Ramirez vigorously denied that they met with attorney Hernandez or had any such discussion. Other evidence showed that attorney Hernandez did have a meeting with his clients and their family members in a room at the jail before the brothers were placed in their cells.

Chief Deputy Ramirez testified that he received a telephone call from Karem, whom he knew as a television newsreporter, requesting an interview with the Hernandez brothers. Ramirez was in the sheriff's administrative offices and did not know that the Hernandez brothers had been booked. He denied Karem's request. Ramirez again rebuffed him, explaining that jail policy permitted interviews with an inmate only upon order of a district judge after which the inmate would be taken to the courthouse. He acknowledged, however, that inmates had telephone privileges and could call anyone they desired. Ramirez checked with the sheriff who was nearby. The sheriff confirmed the policy as stated by Ramirez. Karen then wrote his name and telephone number on a slip of paper and asked Ramirez to deliver it to the Hernandez brothers. Ramirez described Karen as a likeable, but persistent and persuasive individual. Ramirez agreed to deliver the slip of paper just to get Karem "off of his back." He had never done anything like that in his twenty-three year law enforcement career.

Ramirez first went to Julian Hernandez's cell and told him of the news reporter's request, but advised him not to talk with Karem and to consult his attorney. Julian replied: "No, no, no, that's my brother." Ramirez then want to the appellee's cell and repeated the same message and advice. Ramirez did not give any *Miranda* warnings as it was not his purpose to take a statement. He did not discuss with appellee the charge against him. Appellee told Ramirez that he had already talked to his attorney, and indicated that he wanted to talk with Karem. Ramirez then instructed Charles Reid, a jail runner, that if appellee wanted to make the call to see that a telephone was made available to him. Ramirez gave Reid the slip containing Karem's name and telephone number.

Ramirez returned to his office and informed Karem that the message had been delivered, but that he had advised appellee not to talk to Karem. However, he told Karem to expect a call from the appellee. Karem left for the television station. Karem called Ramirez in about fifteen minutes to tell that appellee had not called. Ramirez contacted the booking desk and made inquiry. He was informed that appellee was at that point talking to Karem. Ramirez acknowledged that he knew Karem was a reporter seeking an interview with persons charged with murder, but he did not know if appellee would make the call and he had no thought of trying to solve a murder.

Charles Reid, the jail runner, testified that he first took Ramirez to Julian Hernandez's cell. After some conversation, Julian told them that his brother would do the "talking." Reid then took Ramirez to the appellee's cell. Ramirez asked appellee if he had talked to his lawyer and informed

him of the newsreporter's request. According to Reid, appellee stated that he had talked with his lawyer, and that they (the brothers) wanted to tell "our side of the story." Ramirez instructed Reid to make a telephone available to appellee at 7:15 p.m., and gave Reid a slip of paper with a name and telephone number on it. Reid transferred appellee to another cell with a telephone and gave him the slip of paper. Later Ramirez called and inquired why appellee was not talking to Karem. Reid went to the cell, took the phone away from the appellee and determined that Karem was already on the line. He reported this to Ramirez.

Brian Karem, reporter for KMOL–TV, testified that his station had been "invited" by the district attorney's office to attend the surrender of the Hernandez brothers. He acknowledged that the idea for an interview with the brothers was his alone, though he had earlier gained the impression from Hernandez family members that the brothers might be willing to talk. He denied that the police had requested his assistance. Being rebuffed by Ramirez in his initial request for an interview Karem went to the Sheriff's office. He was again told "No," but after some maneuvering on his part, Ramirez finally agreed to take Karem's name and telephone number to the Hernandez brothers. When Ramirez returned he told Karem that he had advised appellee not to talk to Karem, but Karem should expect a call about 7:10 p.m. Karem returned to the television station. When the call did not come, Karem telephoned Ramirez. Shortly thereafter, Karem received appellee's telephone call. The interview was taped, edited, and placed on the television newscast that night. Karem gave no warnings to appellee at anytime.

Appellee, testifying for the limited purpose of the suppression hearing, stated that Ramirez came to his cell and asked if "I wanted to let the public know my side of the story," and informed him that his brother had said he should talk. Ramirez also told appellee it would be to his benefit to talk to "this person so all of us could know your side of the story." Appellee told Ramirez that his attorney had counseled him not to talk, but "I'll see about it." Appellee testified that he did not know Karem and did not want to call him.

According to the appellee, he was placed alone in another cell containing a telephone. He did not call the number he had been given, but called home and talked to his mother and a cousin. His mother was unable to set up a three-way conference call, but his cousin, Debra Ledesma, dialed the right numbers. Appellee asked her to stay on the line while he talked to Karem. Appellee stated that Karem did not, in their conversation, threaten him in any way. Karem asked him what happened and that he told Karem what he knew. The record shows that appellee initially informed Karem that his attorney and "the detectives" had told him "to say nothing." The conversation lasted twenty-five minutes and was terminated when the guards came to the cell to get appellee to change into inmate clothing.

Appellee admitted that "in a sense" he wanted to talk to the press so he could be heard "that I wasn't wrong and what happened," and to make his claim of self defense. He felt threatened by Ramirez's remark that "nobody is going to know your side of the story," and pressured by Reid coming to the cell to see if he had made the call to Karem. Appellee acknowledged, however, that he was not forced by Ramirez, Reid, or Karem to say words. Appellee revealed that while he was satisfied with his attorney's past performance, he wasn't sure his attorney could represent him in "a case as crucial as this." He was just afraid his side of the story would never "get out." Appellee was later disappointed with Karem's story, "the way it came out," as "it left too many things out" and was "censored."

In rebuttal, Ramirez denied that he told appellee the public would not know his story unless appellee talked to Karem, or that it would be to appellee's advantage to make the telephone call. Ramirez reiterated that he told appellee not to talk to Karem. Ramirez also stated that he had no conversation with attorney Hernandez until after the telecast. Reid also testified

in rebuttal. He denied that he had coerced the appellee, and stated he went only once to the cell to see if the appellee had called Karem. On cross-examination, Reid stated that Ramirez did not advise appellee against talking to Karem. On re-direct examination, Reid admitted, however, that part of the conversation between Ramirez and the appellee was in the Spanish language which he did not understand.

*Sixth Amendment Right to Counsel— Attachment and Invocation*

▮ The Sixth Amendment right to counsel does not attach until after the initiation of formal charges. *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986); *see also Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *United States v. Mitcheltree,* 940 F.2d 1329 (10th Cir.1991). It does, however, attach at the initiation of adversary judicial criminal proceedings. *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984), whether by way of formal charge, preliminary hearing, indictment, information or arraignment. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). In the instant case, the State acknowledges that at the time of the telephone conversation in question adversarial proceedings against the appellee had commenced for the purposes of the Sixth Amendment right to counsel. We agree. *See Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *McCambridge v. State,* 778 S.W.2d 70, 76 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 910, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990); *Nehman v. State,* 721 S.W.2d 319, 321–22 (Tex.Crim.App.1986). In Texas, a criminal prosecution is considered to be in progress after the accused has been formally arrested and taken before a magistrate, or when he has been indicted or charged by complaint with a criminal offense. *Fuller v. State,* 829 S.W.2d 191, 205 (Tex.Crim.App.1992); *see De Blanc v. State,* 799 S.W.2d 701, 706 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); *Lucas v. State,* 791 S.W.2d 35, 44– 45 (Tex.Crim.App.1989); *Barnhill v. State,* 657 S.W.2d 131, 132 (Tex.Crim.App.1983).

In the instant case, a formal complaint charging appellee with murder had been filed and an arrest warrant issued. After appellee's formal arrest, he was taken before a magistrate for a "warning hearing" under the provisions of TEX.CODE CRIM. PROC.ANN. art. 15.17 (Vernon Supp.1992) [2] at the hearing appellee was represented by formal counsel. The State appeared by its district attorney. Appellee was advised by the magistrate of the formal charge against him, and given certain warnings equivalent to those required by *Miranda.* *See also* TEX.CODE CRIM.PROC.ANN. art. 38.22 (Vernon 1979). Appellee claimed indigency and requested the appointment of counsel which request was granted.[3] Bail, however, was denied and the appellee remanded to jail. Certainly adversarial proceedings had been initiated for Sixth Amendment purposes. *Nehman,* 721 S.W.2d at 322; *Higginbotham v. State,* 769 S.W.2d 265, 268–69 (Tex.App.—Houston [14th Dist.] 1989), *rev'd in part on other grounds,* 807 S.W.2d 732 (Tex.Crim.App. 1991); *Alford v. State,* 788 S.W.2d 436, 439 (Tex.App.—Houston [14th Dist.] 1990, no pet.).[4]

While the State agrees, it argues that the appellee did not invoke his Sixth Amendment right to counsel. We do not agree. Under the circumstances described, the Sixth Amendment right to counsel was invoked. *Cf. Green v. State,* 667 S.W.2d 528, 532 (Tex.Crim.App.1984); *Coleman v.*

---

**2.** The distinction between an article 15.17 hearing and an "arraignment" in Texas under Chapter 26 of the Texas Code of Criminal Procedure was explained in *Watson v. State,* 762 S.W.2d 591, 594 n. 4 (Tex.Crim.App.1988).

**3.** In *McLeod v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) it was held that after formal charges the police could not elicit information even though counsel had not yet been appointed.

**4.** *Cf. Wyatt v. State,* 566 S.W.2d 597, 600 (Tex. Crim.App.1978) (an article 15.17 hearing is not a critical stage of proceedings in absence of formal charges).

*State*, 646 S.W.2d 937, 940 (Tex.Crim.App. 1983); *see also Michigan v. Jackson*, 475 U.S. 625, 627–28, 106 S.Ct. 1404, 1405–07, 89 L.Ed.2d 631 (1986). *Lucas v. State*, 791 S.W.2d 35, 45–46 (Tex.Crim.App.1989) cited by the State is clearly distinguishable on the facts.

*Sixth Amendment Jurisprudence*

■ To better understand the instant case, a brief review of the jurisprudence of the United States Supreme Court surrounding the Sixth Amendment is necessary. The text of the Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." The essence of the right is the opportunity for a defendant to consult with an attorney, and to have him investigate the case and prepare a defense for trial. This was recognized in *Powell v. Alabama*, 287 U.S. 45, 58, 71, 53 S.Ct. 55, 60, 65, 77 L.Ed. 158 (1932). In more recent times, the Supreme Court in a line of cases beginning with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and extending through *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1984), has held that once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements "deliberately elicited" from a defendant without an express waiver of the right to counsel. *See Michigan v. Harvey*, 494 U.S. 344, 345, 110 S.Ct. 1176, 1177, 108 L.Ed.2d 293 (1990). Appellee contends that *Massiah* is the seminal case in this area.

In *Massiah*, the defendant and one Colson were charged with narcotics offenses and released on bail. Massiah had retained counsel. Colson decided to cooperate with the authorities, and conducted a conversation with Massiah which was monitored by federal agents. Massiah's incriminating statements were introduced against him at trial. In reversing the conviction, the Court held that the government agents had violated Massiah's Sixth Amendment right to counsel by "us[ing] against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel." *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203.[5] It would appear that the "Sixth Amendment analysis under *Massiah* turns on police intent." Jonathan Marks, *Confusing the Fifth Amendment with the Sixth: Lower Court Misapplication of the Innis Definition of Interrogation*, 87 Mich. L.Rev. 1073, 1076 (1989).

Thirteen years later, *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) rejuvenated the almost dormant precedent of *Massiah*. Williams, an Iowa defendant, was arraigned in Davenport on an outstanding arrest warrant. Prior to his transportation to Des Moines on the murder charge, police had assured Williams' counsel that Williams would not be interrogated during the trip. On the trip a detective made a "Christian burial speech," after which Williams directed the officers to the body. The Supreme Court found that the Sixth Amendment right to counsel had attached at the Davenport arraignment, and that it was clear the detective had designedly set out to elicit information from Williams. The Court concluded that the circumstances were constitutionally indistinguishable from those presented in *Massiah*. *Brewer*, 430 U.S. at 400, 97 S.Ct. at 12. The language used in both *Massiah* and *Williams* would seem to require action undertaken with the specific disclosure. Wayne La Fave and Jerald Israel, Criminal Procedure, § 6.4 at 474 (1984) (hereinafter La Fave).

In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the defendant was arrested, incarcerated and indicted for robbery. An FBI agent contacted another inmate (Nichols), who had been a paid informant for some time. The agent told Nichols to be alert to any state-

---

5. *Massiah*, in effect, took the right to legal representation out of the courtroom and applied it so that the accused was afforded a right to counsel role not previously recognized under the Sixth Amendment. *See* Patrick Howe, Comment, *Cleaning Up the Counsel Clause: Revisiting Massiah v. United States*, 25 U.S.F.L.Rev. 93, 94 (1990).

ments made by federal prisoners, but not to initiate conversation with or to question Henry about the robbery. After his release Nichols reported the incriminating statements made by Henry. Nichols was paid for his information. Applying the *Massiah* rule, the *Henry* court held that Nichols was a government agent and had through his conversations with Henry, deliberately elicited the statements in violation of Henry's Sixth Amendment rights. *Id.* at 274, 100 S.Ct. at 2188.

"The last piece of the *Massiah* doctrinal puzzle was put in place by the Court in *Maine v. Moulton* [474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)], a case which presented a factual pattern quite analogous to that of *Massiah.*" Martin Bahl, Comment, *The Sixth Amendment as Constitutional Theory: Does Originalism Require that Massiah Be Abandoned?* 82 J.CRIM.L. & CRIMINOLOGY 423, 436 (Summer 1991). *Moulton* applied the *Henry* analysis to a situation outside the jailhouse setting. Moulton and his co-defendant, Colson (not the same co-defendant in *Massiah*) were indicted for receiving stolen goods. Moulton retained counsel and pleaded not guilty. Following his release on bail, Moulton made incriminating statements to Colson, who was cooperating with the police, and was "wired for sound." The *Moulton* scenario was unique in two ways: the accused had personally arranged for the meeting with Colson where the incriminating statements were made, and the government was using Colson to investigate crimes other than the one for which the accused had been indicted. The Court was not impressed that these were factual distinctions, and held that the case fell under the rubic of *Massiah.* The Court held that the fact Moulton initiated the meeting was irrelevant. The Court explained that while the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused, a "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much of the breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a *State agent.*" *Moulton*, 474 U.S. at 176, 106 S.Ct. at 487 (Emphasis added).

After *Moulton*, the *Massiah* doctrine was largely in place, but a gloss was added. *Henry* did not determine whether the Sixth Amendment right to counsel is violated where an informant is placed in close proximity to an accused, but makes no effort to stimulate the conversation about the crime charged. *Henry*, 447 U.S. at 271 n. 9, 100 S.Ct. at 2187 n. 9. This question was answered in *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), where no Sixth Amendment violation was found in a "listening post" situation. After Wilson's arraignment, a paid police informant in the same cell listened to and reported Wilson's incriminating statements, but did not question Wilson. *Wilson* distinguished *Henry* on the ground that in *Henry* the informant, although he did question the defendant, stimulated conversation in order to elicit incriminating information. *Wilson*, 477 U.S. at 458, 106 S.Ct. at 2629; *see also United States v. Mourad*, 729 F.2d 195, 201–02 (2d Cir.1984) (standing near the defendant with his knowledge while the defendant used the telephone no violation of *Massiah.*).

■ It appears clear that in examining the *Massiah* line of cases that to find a Sixth Amendment violation, the statements in question must have been (1) "deliberately elicited" (2) by a "government agent." *United States v. York*, 933 F.2d 1343, 1355 (7th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). It has been said there are two prongs necessary to prove a *Massiah* violation, the "agency" prong and the "deliberate elicitation" prong. *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir.1991).

The first limitation "agency per se," is consistent with Sixth Amendment principles of adversarial fair play. Private citizens cannot break the Constitution's promise of *balance between government and defendant.* Only State actors are limited by the constitutional mandate of equal, arm's length dealings between sovereign and individual.

James J. Tomkovicz, *An Adversary System Defense of the Right to Counsel Against Informants: Truth, Fair Play, and the Massiah Doctrine,* 22 U.C.DAVIS L.REV. 1, 72–73 (1988) (hereinafter Tomkovicz) (emphasis in original); *see also* Robert Miller, Comment, *Sixth Amendment Exclusionary Rule: Stepchild of The Right to Counsel,* 24 HOUS.L.REV. 765, 776 (1987).

The "agency" prong has not been an issue in any *Massiah* case to reach the United States Supreme Court because the agency per se of the informant has been too clear for discussion. The focus has been elsewhere.

### Who is a State Agent for Purposes of Massiah

■ The rule of *Massiah* and its progeny has not been extended to situations where an individual, acting on his own initiative, deliberately elicits incriminating information from an accused and he is not a government agent. *See York,* 933 F.2d at 1356; *Lightbourne v. Dugger,* 829 F.2d 1012, 1021 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); *United States v. Surridge,* 687 F.2d 250, 255 (8th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982); *see also United States v. Watson,* 894 F.2d 1345, 1348 (D.C.Cir.1990); *Taylor,* 800 F.2d at 1015. The rule also has no application if the government agent who elicits an incriminating response does so exclusively for some other legitimate purpose, *see* LA FAVE § 6.4 at 475, or through luck or happenstance obtains spontaneous and unsolicited incriminating statements. *Wilson,* 477 U.S. at 459, 106 S.Ct. at 2629; *Dugger,* 829 F.2d at 1021; *United States v. Hicks,* 798 F.2d 446, 449 (11th Cir.1986), *cert. denied,* 479 U.S. 1035, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987).

With this background, along with the observation that the Sixth Amendment threshold was crossed by an initiation of proceedings and the invocation of the right to counsel, we must now determine if the *Massiah* rule has been violated in the instant case by the deliberate elicitation of incriminating statements by a State agent. This determination must be made under the facts and circumstances of the instant case considering factors articulated by courts which have reviewed the issue of whether an individual is a State agent. *Taylor,* 800 F.2d at 1015.

■ As earlier noted, appellee's Sixth Amendment right to counsel had attached and he had invoked that right. Regarding the threshold agency inquiry, no bright line test for determining whether an individual is a government or State agent for the purpose of the Sixth Amendment has emerged. *Dugger,* 829 F.2d at 1020; *Taylor,* 800 F.2d at 1015. It has been observed, however, that the creation of an agency depends upon the existence of an agreement between the government or State and the informant at the time the elicitation takes place. *See Taylor,* 800 F.2d at 1015; *Thomas v. Cox,* 708 F.2d 132, 136–37 (4th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); *Metcalf,* 698 F.2d 877, 882–83 (7th Cir. 1983); *United States v. Calder,* 641 F.2d 76, 78–79 (2d Cir.), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981); *State v. McCorgary,* 218 Kan. 358, 543 P.2d 952, 958 (1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976). Where the government or State has entered into an arrangement with a jail inmate or private citizen agreeing to pay him for incriminating statements from another inmate, an agency relationship may have been established. *See Henry,* 447 U.S. at 270, 100 S.Ct. at 2186; *Commonwealth v. Harmon,* 410 Mass. 425, 573 N.E.2d 490, 492 (1991). However, an inmate or private citizen who has not entered into any agreement with the government and who reports incriminating evidence out of conscience or even "an encouraged hope to curry favor" is not acting as a government agent. *Cox,*

708 F.2d at 136; *Watson*, 894 F.2d at 1348; *Dugger*, 829 F.2d at 1021. An individual's action will not be attributed to the State if no promises are made for that individual's help and if nothing was offered to or asked of that individual. *Commonwealth v. Rancourt*, 399 Mass. 269, 503 N.E.2d 960, 964 (1987); *Harmon*, 573 N.E.2d at 492; *see also State v. Joly*, 219 Conn. 234, 593 A.2d 96, 107 n. 12 (1991); *People v. Belgrave*, 172 A.D.2d 335, 568 N.Y.S.2d 404, 405 (First Dept.1991); *State v. Turner–Bey*, 812 S.W.2d 799, 809 (Mo.App., W.Dist. 1991, appl. to transfer denied); *State v. Bruneau*, 131 N.H. 104, 552 A.2d 585, 588 (1988) (Souter, J.).[6]

## Was Karem a State Agent?

■ In the instant case, Karem was an aggressive television newsreporter pursuing his professional employment. He was not involved in law enforcement or employed by any State agency. Karem decided on his own to seek an interview with the Hernandez brothers. He was twice rebuffed by Chief Deputy Ramirez when he sought the interview. Karem indicated "a great deal of maneuvering" was necessary to convince Ramirez just to take his name and phone number to the Hernandez brothers.

Karem denied that he had any agreement or arrangement with the San Antonio Po-

**6.** We are aware of the cases discussing the test for determining whether an individual is a state agent in the context of the fifth Amendment and Tex.Code Crim.Proc.Ann. art. 38.22 (Vernon 1979). In *Henson v. State*, 794 S.W.2d 385, 390 (Tex. App.—Dallas 1990, pet. ref'd), the court stated:

> In deciding whether a non-law enforcement questioner was acting as an agent of law enforcement, we must consider numerous factors in light of the existing circumstances. *McCrory v. State*, 643 S.W.2d 725, 727 (Tex. Crim.App.1982). The record as a whole must clearly establish that appellant's statements resulted from a calculated practice which all agents of the State involved knew was reasonably likely to evoke an incriminating response from him. *Cates*, 776 S.W.2d at 172 (citing *McCrory*, 643 S.W.2d at 743) [*Cates v. State*, 776 S.W.2d 170 (Tex.Crim.App.1989) ]. In addition, we must consider whether Chandler [the questioner] was known to law enforcement personnel and whether it was reasonably likely that he would evoke or elicit an incriminating response within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Cates*, 776 S.W.2d at 173.

The *Henson* court found Chandler was not a state agent.

In *Paez v. State*, 681 S.W.2d 34, 37 (Tex.Crim. App.1984), the court held that the safeguards attendant to custodial interrogation do not come into play unless the person to whom the statements are made is acting pursuant to a police practice. *See also Macias·v. State*, 733 S.W.2d 192, 195 (Tex.Crim.App.1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). *Paez* and *Cates* both involved investigators with the Texas Department of Human Resources.

In *Macias*, an assistant district attorney requested the jailer to put one Clarke in the cell with Macias. Clarke had given information to the district attorney previously. Neither Clark nor the jailer were informed why Clarke was to be placed together with Macias. Later Macias made statements to Clarke, who then asked to see the district attorney. Clarke reported Macias' statement and informed the prosecutor that another cellmate, Parker, overheard the conversations. Parker, not Clarke, testified at Macias' trial. The Court of Criminal Appeals held that Clarke was not an agent of law enforcement personnel and that article 38.22 did not preclude the admission of Macias' statements. The Court expressly observed that no Sixth Amendment right to counsel question was raised. *Macias*, 733 S.W.2d at 194 n. 2. *See also Baldree v. State*, 784 S.W.2d 676, 686 (Tex.Crim.App.1989). *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990); *Ortiz v. State*, 727 S.W.2d 37, 39 (Tex.App.—San Antonio 1987, pet. ref'd); *Arnold v. State*, 659 S.W.2d 45, 48 (Tex.App.—Houston [14th Dist.] 1983, no pet.).

The fact that a newsreporter who was summoned by a defendant to a jail cell, first spoke with the police about the interview did not establish that the reporter who later gave no warnings prior to the interview, was an agent of the police or working on their behalf. *Lipps v. State*, 254 Ind. 141, 258 N.E.2d 622, 627 (1970).

Further, in *People v. Guilmette*, 1 Cal.App.4th 1534, 2 Cal.Rptr.2d 750, 753 (1st Dist.1991), a conversation between the victim of the crime and the defendant which occurred when the defendant called the victim from jail was held not to be custodial interrogation, even though the defendant was transferred to a section of the jail where he could make phone calls and the police had affixed a recording device on the victim's telephone. The case was decided in the Fifth Amendment context. *See also Lacca v. State*, 696 S.W.2d 645, 648 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd) citing *Walters v. State*, 677 S.W.2d 629 (Tex.App.—Eastland 1984, no pet.); *Tasby v. State*, 679 S.W.2d 78, 79 (Tex.App.—Texarkana 1984, pet. dism'd). ·

The foregoing cases decided under the Fifth Amendment or article 38.22 are not controlling under the Sixth Amendment, but furnish some guidelines.

lice Department, the Sheriff's Office, the District Attorney's Office or any law enforcement agency. This was confirmed in part by the testimony of three San Antonio police officers who were in charge of the investigation of the murder of their fellow officer. The Sheriff's office was not exercising jurisdiction or involved in the murder investigation as the alleged offense occurred within the city limits. The Sheriff, of course, was the administrator of the county jail where the Hernandez brothers were incarcerated. The State did not bargain for Karem's assistance or promise him any benefit, compensation or consideration for his help. No instructions were given to him.

After his telephone interview with appellee, Karem made no report to the police, the Sheriff's Office, or other authorities. Instead he caused the recorded conversation to be altered and edited to prepare it for a television newscast. The alterations resulted in some erasures on the tape, indicating little or no interest in preserving evidence for the purpose of prosecution. It appears that subpoenas by the police, the district attorney, and the defense counsel were issued or contemplated before the tape was finally made available. *Cf. Karem v. Priest,* 744 F.Supp. 136, 137 (W.D.Tex.1990).

It would be difficult to attribute Karem's activities to the State. He was a self-initiated informant who had no arrangement with the State and was at no time subject to the control of the State. Karem was clearly acting on his own in eliciting statements from the appellee.

It is merely a tautology to argue that the government should not be in the business of providing a market for information that infringes Sixth Amendment rights; there is no infringement unless the informant was a government agent, and there is no agency absent the government's agreement to reward the informant for his services.

*York,* 933 F.2d at 1357. Under the acts and circumstances of this case, Karem was not a State agent. *Massiah* and its progeny has not been extended to a situation such as the instant one.

### *A Massiah Violation Without a State Agent?*

■ In his argument appellee contends, at least in part, that agency is not the "crux of this case." Appellee in his brief states:

> Our complaint here is not that Karem was an agent of the State, but rather, that obvious State actors—Copeland [Sheriff] and Ramirez [Chief Deputy] and Reid [jailor]—themselves deliberately elicited the information by facilitating the contact between Karem and appellee, knowing full well that Karem intended to question appellee about the homicide and then broadcast that interview on television. Because this deliberate elicitation, this knowing exploitation, was done directly by State actors, it matters not whether Karem himself was an agent of the State.

Appellee relies upon language in *Moulton* and *Henry* such as "intentionally creating" or "knowingly exploiting" a situation "likely to induce" defendant to make inculpatory statements. One commentator has referred to *Henry* as a "confusing case," and notes "the majority's loose language about the government being barred from 'intentionally creating a situation likely to induce Henry to make incriminating statements.'" 1 LA FAVE, § 6.4 at 474, 476. "*Moulton* is noteworthy for its vague, far-reaching language," according to another commentator. TOMKOVICZ, at 18 n. 77.[7]

7. Professor Tomkovicz, in support of his conclusion, states:
   See *Id.* at 176 [*Moulton v. Maine,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)]. The sixth amendment guarantees an accused the "right to rely on counsel as a 'medium' between him and the State." *Id.* This guarantee includes the State's "affirmative obligation not to act in a manner that circumvents" protections afforded by the right. *Id.* at 171, 176. Thus, the State breaches its obligation by "knowing exploitation" of, or by "knowingly circumventing," an accused's right to have counsel present at confrontations with State's agents. *Id.* at 176, 180.

In calling our attention to the "knowing exploitation" language in *Moulton,* appellee overlooks the sentence in the opinion that followed:

> Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and *a State agent. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487 (emphasis added).

In ruling that Henry's incriminating statements were "deliberately elicited" within the meaning of *Massiah,* the Court found compelling the fact that Nicholas was acting under instructions as a paid informant for the government while ostensibly no more than a fellow inmate, and that Henry was in custody and under indictment at the time. *Henry,* 447 U.S. at 270, 100 S.Ct. at 2186. Both *Henry* and *Moulton* involved government or State agents and surreptitious activity. If Karem was not a State agent, a possibility which appellee concedes, appellee has failed to show how a *Massiah* violation occurred except by reliance on the excerpted language from *Henry* and *Moulton.*[8]

The ambiguity and uncertainty engendered by *Henry* has produced different interpretations and views. "Despite the unfortunate 'likely to induce' language, *Henry* appears to be viewed by the majority as a genuine 'deliberately elicited' case." 1 LA FAVE, § 6.4 at 474. *Henry* involved clear government deceit and was decided in a "jail plant" context. It possibly should be so limited. *See generally,* Welsh White, *Interrogations Without Questions: Rhode Island v. Innis and United States v. Henry,* 78 MICH.L.REV. 1209, 1221, 1237 (1980).

Others view *Henry* as augmenting the *Massiah* by adding a second precondition for a Sixth Amendment violation by a surreptitious informant based on the "likely to induce" language. It has been said that a "basis for attribution" demand had been added by *Henry* to the earlier standard of deliberate elicitation. *See Tomkovicz* at 15–20. The "State must both 'deliberately elicit' and purposefully provide a situation likely to produce a confession to violate the Sixth Amendment" to satisfy *Henry's* dual requirements. Patricia Lyn Hurst, Note, *Overriding a Constitutional Governor: The Supreme Court's Application of the Impeachment Exception in Michigan v. Harvey to the Sixth Amendment Exclusionary Rule,* 69 N.C.L.REV. 551, 559 (1991).

It has also been said that *Moulton* confirmed the two-pronged structure of *Henry's* augmented *Massiah* doctrine. The actual purposeful elicitation by Moulton's informant pursuant to a "deal" with the State was undeniable. The Court could have terminated its opinion at that point under the basic *Massiah* doctrine. Yet the Court denoted considerable attention to the involvement of the police in the informant-defendant meeting indicating that "knowing exploitation" by the State was also essential. Under this view both preconditions of *Henry* must be met to demonstrate a Sixth Amendment right to counsel violation. *See Tomkovicz,* at 18–20.

Whether the view is that *Henry* merely applied *Massiah* to new facts and did not fundamentally restructure the basic doctrine, or that "knowing exploitation" has replaced the "deliberate elicitation" standard, or some other theory,[9] the question whether the informant is a State agent at all is still a threshold determinant of Constitutional protection.

Appellee's argument that, even though Karem was not a State agent, *Massiah* was still triggered by the *specific intent* of three "State actors" to elicit the information by facilitating contact between appellee and Karem is rejected. The role of the Sheriff was limited to confirming for Ramirez the jail policy concerning interviews with inmates and acknowledging that in-

---

8. Appellee also cites *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), but that also involved a state agent.

9. Under any circumstances the Supreme Court still considers *Henry* and *Moulton* within the "deliberate elicited" camp of *Massiah. Michigan v. Harvey,* 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990).

# 318

mates had telephone privileges. Reid, the jail runner, merely followed Ramirez's instructions. There was no showing that he knew Karem or was fully cognizant of the Karem request. Ramirez, a noninvestigative officer, was the reluctant messenger who made a telephone available to appellee at the time. His performance earns no bouquets, only brickbats. With first impressions aside, we conclude, under all the circumstances, that there was no deliberate elicitation by a State agent so as to violate the *Massiah* doctrine.

### Voluntariness—A Factor to be Considered

■ Moreover, in determining whether the State has honored an accused's Sixth Amendment right to counsel, courts have looked closely at the voluntariness of the incriminating statements. *See Wilson v. Henderson*, 584 F.2d 1185, 1190–91 (2d Cir. 1978), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979); *United States v. Hall*, 562 F.2d 336, 337–38 (5th Cir.1977). "But nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with the police in the absence of an attorney." *Harvey*, 494 U.S. at 352, 110 S.Ct. at 11; *United States v. Cummings*, 937 F.2d 941, 946 (4th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 395, 116 L.Ed.2d 345 (1991). If an accused (suspect charged with a crime) may speak with the police under such circumstances, he may voluntarily speak to others. In the instant case, appellee was not overtly questioned by a police officer or surreptitiously interviewed by a undisclosed State agent while he was in custody. We need not, in our discussion, determine whether there was a valid waiver or appellee's Sixth Amendment right of counsel. *Cf.* LA FAVE, § 6.4 at 473. Appellee was no stranger to the jail, having been there on four different occasions. Prior to any in-

criminating statements being made, appellee had been given the *Miranda* warnings by a magistrate and he had consulted with his attorney, who had admonished him not to talk. Appellee informed Ramirez that he had been so advised by his attorney. According to Ramirez, appellee expressed a desire to talk to the news reporter. Appellee's version was that: "I'll see about it." After being placed in the cell with a telephone, appellee admitted that he was not forced to use the phone or to say certain words. Appellee voluntarily called his home and talked to his mother. He directed a cousin to set up a three-way conference call with Karem, and to remain on the line, which she did.[10]

Appellee did testify that Reid entered the cell and took the phone from him. However, appellee had already contacted Karem and was talking to him at the time. Reid's action did not cause appellee to make the telephone call. Despite claiming that Ramirez put the notion in his mind, appellee admitted that he wanted "in a sense" to talk to the press to advance his claim of self-defense and tell how the officer became "rowdy." Appellee also feared that his attorney was not competent to handle a crucial case. When appellee contacted Karem, he told the newsreporter that his attorney and "the detectives"[11] had told him to "say nothing." He informed Karem that he had to say something "because everything that was in the news was wrong." The voluntary, incriminating statements followed. Appellee admitted that Karem didn't force or threaten him to make any statements. Appellee knew the person to whom he was talking was a newsreporter. Appellee knowingly assumed the risk, although it may have displayed a lack of wisdom or unwise trust. The voluntariness of the incriminating statements deliberately made by the properly warned appellee in the absence of counsel, apparently to serve his own pur-

---

10. Clearly the cousin, Debra Ledesma, could testify as to the conversation between appellee and Karem, without violating appellee's Sixth Amendment right to counsel, though this is a technical rather than a practical view.

11. The record does not show that appellee, after his apprehension, had talked to any officer or detectives except Ramirez, who testified that he advised appellee not to talk to Karem and to consult appellee's attorney.

poses, strengthens our conclusion that there was no violation of appellee's Sixth Amendment right to counsel.

### Jackson and Holloway Not Controlling

Appellee notes that in granting the motion to suppress, the trial court expressly relied upon *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) and *Holloway v. State*, 780 S.W.2d 787 (Tex.Crim.App.1989). Both cases involved overt questioning by police officers after the Sixth Amendment right to counsel came into play. The question in each case concerned the validity of the waiver of the right to counsel under the circumstances presented. These cases are distinguishable from the instant case. In addition, much water has passed under the bridge since those decisions were rendered. *Jackson* and *Holloway* would have to be evaluated in light of *Harvey* [12] and *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) and other cases. *Cf. McNeil v. Wisconsin*, —— U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). We do not deem *Jackson* and *Holloway* controlling.

### Conclusion

The sole point of error in this limited appeal by the State is sustained. The trial court's order suppressing the voluntary incriminating statements by appellee to the television newsreporter solely and specifically on the basis of the Sixth Amendment is set aside.[13] The cause is remanded to the trial court.

---

12. *Harvey* held that a statement taken in violation of the prophylactic rule established in *Jackson* may be used to impeach a defendant's false or inconsistent testimony even though the same statement may not be used as substantive evidence in the State's case in chief. The granting of a motion to suppress a statement taken in violation of *Jackson* for *all* purposes may be premature.

13. A defendant does not have the right to cross-appeal or urge cross-points in a State's appeal under Tex.Code Crim.Proc.Ann. art. 44.01 (Vernon Supp.1992). *See Kost v. State*, 785 S.W.2d 936, 940 (Tex.App.—San Antonio 1990, pet. ref'd).