In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-145 CR


____________________



JOE EDWARD LARUE, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Cause No. 85250






MEMORANDUM OPINION


 Joe Edward LaRue appeals the trial court's judgment convicting him of the capital
murder of Donna Pentecost and sentencing him to life imprisonment in the TDCJ-Institutional Division. See Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp. 2006). 

 Donna Pentecost was found murdered on or about October 15, 1989, in her backyard
in Port Neches, Jefferson County, Texas. LaRue was one of six suspects in Pentecost's
murder. At the time, DNA testing proved unsuccessful in determining her killer. As a result
of significant advancements in DNA testing after the time of the murder, the evidence from
the victim's mouth was retested in 2000, and the Texas Department of Public Safety crime
lab report identified the material as LaRue's semen. A Jefferson County grand jury indicted
LaRue for capital murder committed in "the course of committing and attempting to commit"
aggravated sexual assault. (1) The trial began in March 2005, over fifteen years after the
murder. LaRue waived his right to a jury trial in exchange for the State's waiver of the death
penalty. 

 LaRue presents five issues on appeal. His first two issues challenge the legal and
factual sufficiency of the evidence supporting his conviction. In his third issue, LaRue
asserts the trial court committed reversible error by denying his motion for new trial. Next,
LaRue complains the improper introduction of the testimony of jailhouse informant Raymond
Gross violated his constitutional rights. Last, LaRue contends the introduction of his oral
statements to investigators violated article 38.22 of the Texas Code of Criminal Procedure. 
We affirm.

 On October 15, 1989, Officer Rodney Simon, while working patrol for the Port
Neches Police Department, was dispatched to Jordan Industries to pick up an individual who
reported a possible suicide call. Jordan Industries provided contract labor to refineries and
allowed its workers to sleep in on-site barracks. Officer Simon arrived at Jordan Industries

and picked up Gary Byrd, who took him to the body's location at 325 Avenue B in Port
Neches, about half a mile from Jordan Industries. The officer found a naked female lying
on the ground in the backyard on the side of the house opposite from the driveway. The body
was lying face down, with something covering her head. A shirt or blouse was tied into a
knot around her neck. Pentecost's skull had been crushed or blown apart and there appeared
to be remnants of body tissue close by. It appeared the body had been moved slightly from
the actual place where the damage to the head occurred. There was bruising up and down
her back, on her left calf, and on her shoulder blades. 

 Sergeant Paul Lemoine and Officer Charles Moore with the Port Neches Police
Department also arrived at the scene and assisted in the investigation. Rodney Lundy was
found sleeping in the home of the victim. Lundy told Officer Simon he worked for
Pentecost's common-law husband who had gone to work offshore. Dispatch reported
another person from Jordan Industries, later identified as Darrell Fuselier, walking in the
middle of Main Street and acting strange. Officer Moore went to investigate and brought
Fuselier back to the house. Officer Moore spoke to the neighbors to see if anyone had heard
anything. The neighbors reported seeing a white female, later identified as Dorthea McGee,
leaving the house at approximately 7:30 a.m. the following morning. 

 Chief Clois Eugene Marsh of the Port Neches Police Department was a lieutenant
detective with the department at the time of Pentecost's death. Lieutenant Detective March
recalled hearing a dog to the west of the yard barking incessantly while he was working the
crime scene. Nothing in the house indicated any kind of struggle that would explain
Pentecost's injuries. At the scene, Lieutenant Detective Marsh talked to Lundy, Byrd, and
LaRue. Lundy was arrested on an unrelated warrant for a motion to revoke probation. Greg
Slim, Pentecost's common-law husband, later identified Pentecost's body and was eliminated
as a suspect. 

 The officers collected brain matter, a cigarette butt and ashes, hair samples, and
clothing items from the scene. At that time, they did not find a potential weapon or any
bullet fragments. A rape kit was collected from the victim during the autopsy. 

 The autopsy report admitted into evidence stated that "a head-crushing injury with a
blunt instrument should first be considered as the cause of death until proven otherwise." 
The report also noted multiple bruises about the head, small bruises in the lower extremities,
and abrasions on the neck consistent with "a ligature type of wound." Wrapped tightly and
tied around her neck was a blood-stained shirt. The soles of her feet were dirty. 

 The Port Neches Police Department identified six primary suspects early on in the
investigation. Consent was obtained from the suspects and blood was drawn for purposes
of scientific and genetic testing. Blood stains from the victim were also submitted for
testing. 

 On October 16, 1989, officers went back to the house, collected fingerprints from the
interior side of the storm door, attempted to lift fingerprints from the exterior of the door, and
collected cigarette butts from the scene. One officer noticed two concrete blocks on the
edge of the patio and three impressions where concrete blocks had been. Two of the
impressions were dry and had obviously been exposed to the elements and air for a while. 
The third impression was moist and the dirt was darker. Two of the blocks were located
under a jacked-up vehicle in the driveway. Lieutenant Weldon located a concrete block in
a brush pile on the opposite side of the street. This block was of the same type and size as
the two blocks supporting the car and those next to the patio. There were stains on the block. 
The fact that the grass under the brick appeared to be the same as the grass surrounding the
brick suggested the brick had not been there very long. Despite further investigation and
testing, no blood evidence was ever found in the house.

 Officer Wigley's October 10, 1990, investigation report was admitted at trial. The
report stated that on March 22, 1990, he received a phone call at the Port Neches Police
Department that a person had knowledge concerning the murder. Officer Wigley interviewed
the informant who was, according to the report, intoxicated at the time he gave his statement. 
The informant wanted to remain anonymous because he worked at Jordan Industries and had
been threatened by fellow employees. He said a woman named "Jewel" told him she knew
Pentecost's murderer was a large black male who dealt cocaine and heroin in Port Arthur. 
Jewel did not provide such information to the police because she feared for her children's
safety. The informant also stated that Fuselier indicated to him that Fuselier had been with
Pentecost and a large black male shortly before her murder. Fuselier, Pentecost, and the large
black male had gone earlier to the west side of Port Arthur to make a drug deal. The deal
went bad, and the three returned to Jordan Industries. Pentecost attempted to borrow $140
from other Jordan Industries employees, including the informant. 

 According to Officer Wigley's account of the informant's statement, Fuselier told the
informant that while the three were riding around later, the black male had threatened the
lives of Pentecost, Fuselier, and another female. Fuselier had asked the black male to let him
out of the vehicle, which he did, and then the black male told Fuselier he would take the
victim home. Fuselier later told the informant the victim was murdered thirty or forty
minutes after he got out of the car and that the black male contacted Fuselier and told him
if he told anyone about the murder he would kill him. The informant said Fuselier had not
cooperated with the police because he also feared for his life. The informant's actual
statement was later admitted into evidence and reflected the information in the officer's
report. 

 An anonymous 911 call identified the perpetrators as Fuselier and "a black from the
west end of Port Arthur." Lieutenant Detective Marsh identified Byrd as the caller. 

 In 1989, Irma Rios with the Texas Department of Public Safety crime lab was
assigned to determine the presence and origin and type of blood on several pieces of
evidence. Rios testified human blood was detected on the cement block but blood grouping
results were inconclusive. She blood-typed the blood samples from the suspects. She sent
the oral swabs from the victim to the Analytical Genetic Testing Center in Denver, Colorado,
because the DPS crime lab did not have DNA testing capabilities. The case was resubmitted
for DNA testing in 2000 after the DPS acquired DNA testing capability. 

 In 2000, the DPS crime lab reports concluded LaRue was the source of the semen on
an oral swab from the victim. Pentecost and LaRue were excluded from the contributors of
the stain on the cigarette butt. LaRue could not be excluded as the contributor of two stains
from Pentecost's fingernail samples. Two fingerprints were lifted from the door of the
victim's residence, but neither matched any prints of the suspects. 

 Raymond Gross also testified for the State. He was incarcerated in the Jefferson
County Jail with LaRue after LaRue's indictment for Pentecost's murder. Gross was taking
a paralegal class dealing with forensics and DNA when he met LaRue. LaRue began asking
Gross questions about how long semen could stay inside and outside a body and still be
tested. In subsequent discussions, LaRue told Gross specific details about how he murdered
Pentecost. 

 LaRue told Gross that on the night of the murder he went to the Boudain Hut or the
Boudain Bar with a male named "Mark." They drank and got "loaded" on cocaine and
marijuana. LaRue drove Mark to Pentecost's house between 1:00 or 2:00 a.m. and Mark
passed out in the car on the way. LaRue and Pentecost got into an argument outside. He
made her disrobe, choked her with a shirt, and forced her to have oral sex on the porch at the
back of the house. 

 After another argument, LaRue hit her on the side of her head and she ran from him. 
He ran after her, hit her again, and knocked her to the ground. Pentecost started screaming
or cussing at LaRue; the neighbor's light came on; and a dog started barking. LaRue choked
Pentecost again to quiet her. Once she started whimpering, he walked away. 

 When Pentecost then told LaRue he would spend the rest of his life in prison, he
walked over to a cement block threw it down on her head. He pulled the body back towards
the house because the neighbor's dog was barking and he thought the dog might be smelling
the blood. He saw brain matter coming from her head. He panicked and took the block to
the car and cleaned off some of the hair and blood with half a bottle of bourbon. He disposed
of the block across the street in a vacant lot. 

 Gross asked LaRue to draw a diagram of the crime scene. Unbeknownst to LaRue,
Gross had placed carbon paper under the paper in order to obtain a carbon copy of the
diagram. The carbon copy of the diagram was admitted at trial. 

 Another inmate, Jermaine Norman, also testified for the State. Norman was being
held in the Jefferson County Detention Center when he overheard LaRue tell another inmate,
William Duffy, that LaRue had sex with his victim, hit her in the head with a brick, and was
one of the three who found the body. 

 Gary Byrd testified he worked with Pentecost and LaRue at Jordan Industries in Port
Neches in October 1989. Byrd, LaRue, and Fuselier lived onsite at Jordan Industries. Byrd
had a felony conviction for burglary of a habitation. He was a narcotics informant for law
enforcement. According to Byrd, drugs were common at Jordan Industries and Pentecost
would bring dealers to Jordan Industries to sell drugs. 

 On Saturday, October 14, 1989, Byrd saw LaRue during the day at Jordan Industries. 
LaRue said he and Fuselier were going to the Boudain Hut in Port Arthur. Once LaRue and
Fuselier left, Byrd did not see LaRue again until 2:00 or 3:00 a.m. At that time, Byrd went
outside and saw LaRue sitting in a car in the Jordan Industries parking lot; LaRue was talking
with another man. Byrd went back in, and after a few minutes, LaRue came in, showered,
and got in his bunk. 

 On Sunday morning, the Jordan Industries dispatcher informed the workers that a job
in Louisiana had come in for the next day. LaRue suggested they go to Pentecost's house to
tell her about the job. Byrd, LaRue, and Terry Collins drove to Pentecost's. They parked in
the driveway and Byrd and LaRue went to the back door while Collins waited in the car. 
Byrd knocked on the back door, then LaRue knocked and called out Pentecost's name. Byrd
then noticed a naked body with its head covered, lying in the yard. He thought the body was
Pentecost's and said, "Oh my God." LaRue was still standing by the door and he said, "My
God." Byrd suggested calling the police, and they went back to Jordan Industries to make
the call. 

 Byrd stated that immediately after Pentecost's body was found, a number of stories
surrounding Fuselier and LaRue surfaced. Fuselier made statements about a heroin dealer
who "mess[ed] around" with Pentecost, had a fight with her, slapped her, and mentioned
something about going across the street to get a brick. On a number of occasions, Fuselier
claimed someone named "Reggie" killed Pentecost. Byrd had no knowledge of any sexual
activity between Pentecost and LaRue, but did acknowledge that LaRue partied with
Pentecost, liked her, and wanted to have sex with her. LaRue told Byrd that Pentecost was
dead because she owed a heroin dealer some money. 

 Inita Felps, a friend of Pentecost, testified that around 10:00 p.m. on October 14,
1989, Felp's niece drove her and Pentecost to drop Pentecost off at Pentecost's home in Port
Neches. Dorethea "Dee" Moreman, another friend of Pentecost's, also testified. Prior to
Pentecost's death, Moreman had moved in with Pentecost and Pentecost's common-law
husband because Moreman and her live-in boyfriend, Rodney Lundy, had broken up. Lundy
later also moved into Pentecost's house. 

 Moreman fell asleep at the home around 8:30 p.m. on October 14, 1989. She did not
remember Pentecost coming home but awoke around 10:00 p.m. and heard Pentecost and
Lundy talking in the kitchen. Moreman told them "good night" and went back to sleep. 
Around 4:00 a.m., she again woke up, went into the kitchen, and noticed the back door was
open and the kitchen light was on. She closed the door, turned off the light, and went back
to bed. Lundy was asleep on the floor in the bedroom where she was sleeping. Moreman
awoke around 7:30 a.m. and left to meet a friend in Beaumont. Lundy was still asleep. She
exited the backdoor and walked to the left towards the driveway. When Moreman returned
home between 9 and 9:30 p.m., the house was blocked off as a crime scene. 

 Moreman knew Pentecost dealt heroin. Pentecost told Moreman that a man named
"Doug" had a crush on Pentecost, but she did not seem overly concerned or in fear of Doug. 
Moreman also stated Pentecost never expressed any fear of Lundy, nor did Moreman know
of any trouble between Pentecost and Pentecost's common-law husband, Greg. Moreman
remembers that LaRue came to the house three or four times. James Droddy, one of the other
suspects, also came by occasionally. 

 LaRue testified at trial in his own defense. He admitted to felony convictions for
aggravated assault in Texas and aggravated assault and kidnaping in New Mexico. He
denied killing Pentecost. In October 1989, he was working for Jordan Industries. He knew
Pentecost through work and had known her several months prior to her death. LaRue
claimed they were friends and she was engaging in sex with him on the side. He said
Pentecost would locate drugs, mainly heroin or cocaine, for him and others. She obtained
the drugs from someone named Augustine. 

 Sometime before 8:00 p.m. on October 14, 1989, LaRue saw Pentecost in front of
Jordan Industries. She got out of a car and went inside. Between 12 midnight and 1:00 a.m.,
LaRue went over to Pentecost's house. They were out on the back porch. LaRue said he
smoked a joint, and Pentecost performed oral sex on him. LaRue testified the act was
consensual. He left and told her he would see her in the morning for breakfast. Pentecost
was clothed when he left. 

 According to LaRue, Jackie Ray Augustine asked LaRue to let him know when
Pentecost was at her home because she owed him money and he wanted to go there to collect
it. After he got back to Jordan Industries, LaRue called Augustine and Augustine said he was
going over to Pentecost's house. LaRue spent the rest of the night at Jordan Industries. 

 When he woke up the next morning, he told Byrd and Collins he was going to get
Pentecost and then go eat. LaRue, Byrd, and Collins walked to Pentecost's house. LaRue
walked upon the back porch and tapped on the door. When no one answered, he started to
call her name. LaRue heard Byrd holler, "Oh, my God, oh, my God." LaRue walked over
to the end of the porch where Byrd was standing and he saw Pentecost's body. They went
back to Jordan Industries and called the police. 

 The next several days rumors circulated regarding what had happened and who had
murdered Pentecost. LaRue said Fuselier confessed to him that Fuselier had murdered
Pentecost. According to LaRue, Fuselier always wore a baseball cap and was bald on top
with long hair in the back, and sometimes he would wear it as a ponytail through the back
of his hat. 

 LaRue gave two statements to law enforcement on October 16, 1989. In one
statement, LaRue stated he had talked with Pentecost on October 13, 1989, in front of Jordan
Industries. Pentecost told LaRue she was afraid of a man that had been living with her and
Greg, and that Greg had told the man to get out by that day because of his heavy drug use
around Greg and Pentecost's two children. She also told LaRue the man threatened her with
a knife on one occasion. Pentecost talked to LaRue for about two hours and then left to get
heroin. She returned to Jordan Industries two or three hours later and appeared to be under
the influence of drugs. Pentecost picked up her hardhat and bag and said she was going
home. The next time LaRue saw Pentecost was when her body was discovered. 

 In another statement on the same day, LaRue stated he and Mark Etheridge went to
the Boudain Hut in Port Arthur on Saturday. They stayed there until 1:30 or 2:00 a.m.
Sunday morning. After they left the Boudain Hut, they stopped at a Fina station and got a
sandwich and then went back to Jordan Industries. He and Mark talked for twenty to thirty
minutes in the parking lot. Mark drove off and LaRue went to the barracks. LaRue stated he
had nothing to do with Pentecost's murder. 

 The trial court also admitted LaRue's unsigned statement, titled "In Custody
Statement" and dated February 23, 1993. The statement states that LaRue was making the
statement to Investigator Tim Smith and that LaRue was giving the statement of his own free
will and in the company of his attorney. He stated he would not sign or swear to the
statement and was told the statement would be used only to assist in a later polygraph
examination. 

 According to that statement, Kerry Bellard and Jackie Ray Augustine approached
LaRue and wanted him to beat up Pentecost because she had stolen drugs from Augustine. 
LaRue indicted he did not know Augustine, but worked with Bellard at Jordan Industries. 
LaRue turned down the job because he was friends with Pentecost and her family. On the
14th or 15th of October 1989, LaRue went drinking at the Boudain Hut in Port Arthur and
returned to Jordan Industries about 2:30 to 3:00 a.m. Bellard and Augustine were in a car
at Jordan Industries when LaRue returned. Bellard asked LaRue to call Pentecost's house
and make sure she was home alone. LaRue did so and was given $500 for making the call. 
He then told Bellard and Augustine he was going to her house to make sure she was alone. 
While a shirt of Augustine's tested positive for human blood several days after the murder,
the blood could not be typed. 

 According to the statement, LaRue and Pentecost had engaged in sexual relations at
least a dozen times. Knowing Bellard and Augustine were waiting on the street corner to
beat up Pentecost, LaRue went to Pentecost's house that night to have sex with her. She
consented to oral sex. He said she was not naked and he was not at the house for more than
15 to 20 minutes. LaRue left and told Pentecost he would see her in the morning. He then
went to the street corner and informed Bellard and Augustine that Pentecost was there alone. 
LaRue walked back to Jordan Industries where he went to sleep. About two days after
Pentecost's death, LaRue learned from Bellard that, after LaRue left Pentecost's house,
Bellard and Augustine had gone there, picked her up, and took her riding around. Augustine
confronted Pentecost about the stolen drugs. Bellard began choking Pentecost, and
Augustine began hitting her. They took her back home, threw her in the backyard, and began
kicking her. Pentecost started screaming and fighting, and Bellard grabbed a brick in the
yard and struck her. Bellard then threw the brick in a field across the street, and he and
Augustine drove off. 

 Defense witness Joe Mason testified he was incarcerated with Raymond Gross in the
Jefferson County Jail in 2002. They had adjacent cells and could speak to each other while
in their cells. According to Mason's testimony, Gross told Mason that if he would "tell the
Court that Joe LaRue told me a confession of guilt of the charge pending against him, that
I could get leniency further down the court - - the appeals court." On about four different
occasions, Gross told Mason that Gross was going to get leniency on his charge by lying to
the Court and saying that LaRue confessed to him. Mason had convictions for murder and
felony theft. 

 Dr. Robert Benjamin, a defense expert on forensic DNA, testified that any expert
opinion as to the time frame that sperm would remain detectable in one's mouth would not
be good science. He explained that a suggested time frame would be solely conjecture
because of the lack of adequate control experiments. Sperm in the mouth would have the
same forensic profile whether the deposit was consensual or non-consensual. A deposit of
semen would not prove or disprove an aggravated sexual assault. Finding DNA samples
under someone's fingernails would also not necessarily indicate whether it was deposited by
a consensual or a non-consensual act. 

 Gorgette Loupe testified that in October of 1989 she was a night driver for Jordan
Industries and did part-time secretarial work. Gorgette stated that Pentecost visited with her
in Gorgette's office from around 9:30 or 10:00 p.m. until a little after 11:00 p.m. Right
before Pentecost left, LaRue returned to Jordan Industries. Sometime after 1:00 a.m.,
Gorgette saw Fuselier arrive at Jordan Industries. He had a shirt on with "red stuff" on it and
he was nervous and agitated. Gorgette claims her husband, also an employee of Jordan
Industries and in charge of security, did a "bunk check" around midnight and LaRue was in
his bunk. The next time she saw LaRue was between 5:00 and 5:30 a.m. on October 15,
1989. However, Gorgette's October 17, 1989, sworn statement stated that Pentecost's
visit with Gorgette at Jordan Industries was on Thursday, October 12, 1989, and made no
mention of her coming to Jordan Industries on October 14, 1989. Nothing in the statement
indicted she saw anything red on Fuselier's clothing. Also absent from the statement was any
reference to her husband's midnight "bunk check." Her statement also said she told police
she fell asleep around 11 p.m and woke up around 1:00 a.m. when LaRue and someone
named "Keith" came in together. 

 Luther Loupe, Gorgette's husband, testified he was working as night dispatcher at
Jordan Industries on the night of October 14, 1989, and the morning of October 15, 1989. 
Luther testified that he saw LaRue "come in and go to bed around 12:30, quarter to 1:00." 
Although Luther did not look in the bed to see who it was, he assumed it was LaRue when
he did bunk checks at midnight, 2:00 a.m., and 4:00 a.m. When he had awakened everyone
between 4:30 and 5:00 a.m. on October 15th, he did not see Fuselier. On cross-examination,
Luther admitted that in 1991 or 1992, he had a stroke and acknowledged he suffered from
memory loss. 

 Coyth Pellerin and her daughter Coyth Whitney testified at trial. Pellerin was
Pentecost's neighbor at the time of the murder. Pellerin lived behind Pentecost, and the back
corner of Pellerin's fence connected up to the back corner of Pentecost's fence. Around
11:00 p.m. on October 14, 1989, Pellerin was washing clothes, and going in and out of her
home to the washhouse behind her house. Around 1:00 a.m., she noticed "party noise"
coming from Pentecost's backyard that was different in "tone." She could not determine
whether something bad was happening. Pellerin heard at least two voices. She saw one
white man with a ponytail that went through the back hole of the baseball cap. Pellerin's
daughter, arrived home around 1:00 a.m. and Pellerin asked Whitney to go outside and listen. 
Pellerin went to bed around 2:30 a.m. and did not awaken again until 8:00 a.m. The next day
Pellerin noticed officers in the neighborhood but they never questioned her. She did not
come forward with her information until 1993 after a private investigator contacted her. She
gave a statement to Lieutenant Detective Marsh in 1993, but the statement did not include
a reference to a man with a ponytail. 

 Coyth Whitney stated she was sixteen at the time of Pentecost's murder and had been
out the night of October 14th. She arrived home between 1:00 a.m. and 1:45 a.m. When she
got inside, her mother asked her to come outside and "tell [her] what [she thought] about
what was going on back there." They went outside and she heard noise from Pentecost's
back yard. Through the fence she saw at least two men walking around and someone sitting. 
Whitney testified there could have been more than two men. She stayed outside "maybe 20
minutes" and then went to bed. She gave a statement to the Port Neches police at the same
time her mother gave her statement. 

 LaRue argues the evidence is legally and factually insufficient to support his
conviction. In a legal sufficiency review, the appeals court assesses all the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could find
the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Poindexter v. State, 153 S.W.3d 402,
405 (Tex. Crim. App. 2005). When conducting a legal sufficiency review, we consider all
of the evidence admitted, whether admitted properly or improperly. Conner v. State, 67
S.W.3d 192, 197 (Tex. Crim. App. 2001); see also Moff v. State, 131 S.W.3d 485, 488 (Tex.
Crim. App. 2004). 

 In a factual sufficiency review, an appellate court views all the evidence in a neutral
light and considers whether the evidence supporting the verdict, although legally sufficient,
"is nevertheless 'so weak'" that the verdict seems "'clearly wrong and manifestly unjust" or
the verdict is "against the great weight and preponderance of the evidence." Watson v. State,
204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006) (quoting Johnson v. State, 23 S.W.3d
1, 11 (Tex. Crim. App. 2000)); see also Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim.
App. 2006) . Under the above standards, all evidence, including circumstantial evidence, is
considered. Nguyen v. State, 54 S.W.3d 49, 52 (Tex. App.--Texarkana 2001, pet. ref'd). 
"Circumstantial evidence is 'direct proof of secondary facts which, by logical inference,
demonstrates the ultimate fact to be proven.'" Cowan v. State, 840 S.W.2d 435, 438 n.10
(Tex. Crim. App. 1992) (quoting Taylor v. State, 684 S.W.2d 682, 684 (Tex. Crim. App.
1984)). 

 To support a conviction for capital murder as alleged in the indictment, the State must
prove LaRue intentionally caused Pentecost's death in the course of committing aggravated
sexual assault. See Tex. Pen. Code Ann. § 19.03(a)(2); Swearingen v. State, 101 S.W.3d
89, 95 (Tex. Crim. App. 2003). Specifically, LaRue argues the verdict is legally and
factually insufficient because three elements of the offense "are not properly supported": (1)
aggravating offense of committing or attempting to commit aggravated sexual assault, (2)
proof of intentionally causing the death, and (3) "in the course of" another offense. 

 We first examine the sufficiency of the evidence supporting the element of intent to
cause the death of Pentecost. Gross testified LaRue told him in detail how LaRue made
Pentecost disrobe, forced her to have oral sex, and threw a cement block down on her head
after she threatened to send him to prison for life. Gross's testimony was corroborated by
other evidence. The autopsy stated that a head-crushing injury with a blunt instrument should
first be considered as the cause of death until proven otherwise. Gross stated LaRue told him
that after LaRue threw the cement block at Pentecost, the neighbor's dog began barking and
LaRue pulled the body towards the house because he thought the dog smelled the blood. 
Lieutenant Detective Marsh testified it appeared the body had been moved from the place
where the damage to the head occurred. He also testified Pentecost's neighbor's dog barked
incessantly while he worked the crime scene. Prior to the receipt of Gross's information by
the Port Neches Police Department, the department's offense reports made no notation of the
barking dog. Gross said LaRue told him he disposed of the block across the street in a vacant
lot. In a brush pile on the opposite side of the street, police located a cement block matching
other blocks from Pentecost's residence. According to Gross, LaRue's account indicated
these events occurred in Pentecost's backyard. The autopsy report notes that Pentecost's feet
were soiled and law enforcement testified nothing in the house indicated any kind of struggle
that would explain Pentecost's injuries. 

 The DNA testing showed LaRue's semen in Pentecost's mouth. Norman overheard
LaRue tell another inmate that LaRue had sex with the victim and hit her in the head with a
brick. The evidence shows that not until at least eight months after Pentecost's murder did
LaRue include in any statements to law enforcement that he was with Pentecost the night she
was murdered. 

 Case law holds that intent to kill may be inferred from the use of a deadly weapon. 
See Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). LaRue argues specifically
that "[t]his case has no admission of the use of a weapon." The autopsy report states, "A
head crushing injury with a blunt instrument should first be considered as the cause of death
until proven otherwise." The report comports with testimony in the record of the use of a
cement block as a deadly weapon to strike Pentecost on the head. Throwing a cement block
at Pentecost's head evidences an intent to kill. Based on the circumstantial evidence
presented at trial, the trial court could have rationally concluded LaRue intentionally caused
Pentecost's death. The evidence is legally sufficient on the element of intent.

 We next consider, by viewing the evidence in a neutral light, the factual sufficiency
of the evidence to support the trial court's finding that LaRue intended to kill Pentecost. 
LaRue argues Gross's testimony is too weak to support a finding of intent. Although there
are multiple references to alleged potential perpetrators other than LaRue and rumors of
incentives for inmates to implicate LaRue, we must give due deference to the fact finder's
determinations concerning the weight and credibility of the evidence. On a factual
sufficiency challenge, a reviewing court reviews all the evidence in determining whether the
verdict "seems clearly wrong or manifestly unjust" or "against the great weight and
preponderance of the evidence." Watson, 204 S.W.3d at 414-15, 417. Deferring to the fact
finder's assessment of weight and credibility, Gross's version is believable and does not
contradict the finding of guilt. The evidence is factually sufficient to support the trial court's
finding that LaRue intentionally killed Pentecost. 

 LaRue challenges the sufficiency of the evidence supporting the trial court's findings
that he committed aggravated sexual assault and that Pentecost's murder was committed "in
the course of" the aggravated sexual assault. As charged here, aggravated sexual assault
occurs when a person intentionally or knowingly causes the penetration of the mouth of
another person by the sexual organ of the actor, without that person's consent, and the person
uses or exhibits a deadly weapon in the course of the same criminal episode. Tex. Pen.
Code Ann. § 22.021(a)(1)(A)(ii), (2)(A)(iv) (Vernon Supp. 2006). LaRue contends he had
consensual sex with Pentecost the night she was murdered and argues the State presented no
evidence of force used during sex with Pentecost.

 Gross testified LaRue told him he forced Pentecost to have oral sex with him and that
after he forced her to have sex she threatened to send him to prison for life and he threw the
cement block at her. LaRue argues Gross's testimony is too disjunctive and weak. DNA
material taken from Pentecost's mouth proved to be LaRue's semen. Pentecost was found
naked in her backyard with a shirt, applied as a ligature, tied in a knot around her neck. She
had notable bruising to her shoulders. Byrd testified that LaRue stated he had wanted to have
sex with Pentecost. Although LaRue testified he often had consensual sex with Pentecost,
no witnesses at trial testified they knew that LaRue and Pentecost had ever engaged in
consensual sex. For a significant length of time following the crime, LaRue failed to disclose
he had been at Pentecost's and had had sex with her on the night of her murder. Considering
the evidence in the light most favorable to the verdict, we hold the trial court could rationally
find beyond a reasonable doubt that LaRue committed aggravated sexual assault and that he
murdered Pentecost in the course of committing the aggravated sexual assault.

 Viewing all the evidence in a neutral light, even given the relative weakness of each
individual piece of evidence tending to prove guilt, the corroboration between the physical
evidence and Gross's testimony is sufficiently strong that we cannot say the proof of guilt
is so obviously weak as to undermine our confidence in the trial court's determination. 
Further, the great weight and preponderance of the evidence does not contradict the fact
finder's finding of guilt. See Watson, 204 S.W.3d at 414-15, 417. The evidence is factually
sufficient to support the trial court's finding that LaRue, while in the course of committing
aggravated sexual assault, intentionally murdered Pentecost. LaRue's first two issues are
overruled. 

 LaRue's third issue on appeal challenges the trial court's denial of his motion for new
trial. LaRue's motion for new trial alleged he (1) was denied effective assistance of counsel,
(2) did not knowingly and voluntarily waive his right to a jury trial, (3) had discovered new
evidence that one of the State's witnesses had committed perjury, (4) and had evidence which
tended to establish his innocence that could not have been produced at trial. Appellate
counsel's affidavit attached to the motion only restates the bases for LaRue's motion for new
trial. Apparently, the motion was overruled by operation of law as no order on the motion
appears in the record. LaRue also argues the trial court refused to hold a hearing on the
motion, which was supported by affidavit alleging new evidence and witness misconduct. 
The State contends the trial court did not abuse its discretion in not holding a hearing because
LaRue failed to properly present the motion to the trial court and provide supporting
evidence. We review a trial court's denial of a hearing on a motion for new trial for an
abuse of discretion. State v. Gonzalez, 855 S.W.2d 692, 695 (Tex. Crim. App. 1993). A
reviewing court should only reverse the trial court's decision "when the trial judge's decision
was so clearly wrong as to lie outside that zone within which reasonable persons might
disagree." Id. at 695 n.4. (quoting Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App.
1992)). The reviewing court cannot substitute its judgment for that of the trial court, but
instead must decide whether the trial court's decision was arbitrary or unreasonable. Id.
(quoting Landry v. Travelers Ins. Co., 458 S.W.2d 649, 651 (Tex. 1970)). 

 A defendant's right to a hearing on a motion for new trial is not absolute. Rozell v.
State, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). Generally, a hearing is necessary if the
motion and attached affidavit raise matters not determinable from the record that could entitle
the defendant to relief. Id. (citing Wallace v. State, 106 S.W.3d 103, 108 (Tex. Crim. App.
2003)). A complaint raised in a motion for new trial is not preserved unless the motion is
presented to the trial court. Tex. R. App. P. 21.6 (requiring presentment within ten days of
filing unless trial court permits otherwise under the rule); Carranza v. State, 960 S.W.2d 76,
78-79 (Tex. Crim. App. 1998) (construing former Tex. R. App. P. 31(c)). To establish
presentment, the record must show that the movant brought the motion to the trial court's
attention. Id. Filing a motion for new trial alone is insufficient to show presentment. Id. at
78. The presentment requirement is satisfied when the movant "actually deliver[s] the
motion for new trial to the trial court or otherwise bring[s] the motion to the attention or
actual notice of the trial court." Id. at 79. 

 In the present case, there is no trial court order denying his motion for new trial, no
date set on the docket sheet for a hearing on the motion , and no notation or signature by the
judge on the proposed order. The only suggestion of presentment is a statement in the
motion for new trial entitled "certificate of presentment" in which appellate counsel states
the motion was hand-delivered to the trial court. This evidence, however, is insufficient to
establish presentment under Tex. R. App. P. 21.6. See Oestrick v. State, 939 S.W.2d 232, 235
n.5 (Tex. App.--Austin 1997, pet. ref'd)(citing Owens v. State, 832 S.W.2d 109, 111 (Tex.
App.--Dallas 1992, no pet.)). 

 Even if LaRue's motion for new trial was properly "presented," we would still hold
the trial court did not abuse its discretion in failing to hold a hearing. For the movant to be
entitled to a hearing, the movant's motion for new trial must raise a matter not determinable
from the record upon which the movant could be entitled to relief. Reyes v. State, 849
S.W.2d 812, 816 (Tex. Crim. App. 1993). LaRue claims the following: trial counsel was
ineffective; there is new evidence that one of the State's witnesses committed perjury, and
there is evidence tending to establish his innocence that could not have been produced at
trial. However, the motion provides no facts relating to these claims. The affidavit only
restates LaRue's alleged grounds for a new trial. Affidavits that are unsupported by facts and
are conclusory in nature are not sufficient to put the trial court on notice that reasonable
grounds for relief exist. See Jordan v. State, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994);
Buerger v. State, 60 S.W.3d 358, 363 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd);
Alcott v. State, 26 S.W.3d 1, 4 (Tex. App.--Waco 1999), aff'd, 51 S.W.3d 596 (Tex. Crim.
App. 2001). Absent from the motion and affidavit are necessary facts regarding how
LaRue's trial counsel was deficient, the identity and exact testimony of the witness who
allegedly committed perjury, and evidence tending to establish LaRue's innocence. 

 The trial court also did not abuse its discretion in failing to hold a hearing based on
LaRue's allegation in his motion for new trial that he did not knowingly and voluntarily
waive his right to a jury trial. As stated above, a hearing is necessary if the motion and
attached affidavit raise matters not determinable from the record that could entitle the
defendant to relief. Rozell, 176 S.W.3d at 230; Wallace, 106 S.W.3d at 108. The record
shows LaRue signed a written waiver of jury trial and stipulation of evidence. The reporter's
record transcript includes the following exchange:

 THE COURT: Mr. LaRue, I'm going to go over this with you real quick. 
I have in front of me what's entitled the Defendant's
Waiver of Jury Trial, State's Waiver of Death Penalty
and stipulation as to the evidence in the case.

 And I'm going to ask you: Has [your defense counsel]
gone over all three pages of this document with you?


 [LaRue]: Yes, sir.


 THE COURT: And you understand everything contained in this
document to your full and complete satisfaction.


 [LaRue]: Yes, sir.


 THE COURT: You understand that what's going to happen here in a
minute is the jury is going to come in here and I'm going
to cut them loose. The remainder of this case is going to
be tried to me. I will make the decision as to whether
you're innocent or guilty of the offense. And if I find
you guilty, then I'll assess the punishment. You
understand that?


 [LaRue]: Yes, sir.


 THE COURT: Understanding all the rights that you're waiving in this
matter, is that how you want to proceed?


 [LaRue]: Yes, sir.


 THE COURT: Are you asking that I cut this jury loose?


 [LaRue]: Yes, sir.


 THE COURT: You understand once I cut them loose, you don't get them back?


 [LaRue]: Yes, sir.


 THE COURT: Okay. And is that what your request is?


 [LaRue]: Yes, sir.


 . . . . 


 THE COURT: All right. Mr. LaRue, I'm going to ask you, sir: Is this
your signature here on the first page after the sentence "I,
Joe Edward LaRue, joined by my attorneys, give up my
right to a jury in this case"? Is this your signature, sir?


 [LaRue]: Yes, sir. 


The fact that LaRue knowingly and voluntarily waived his right to a jury trial can be
determined from the record. LaRue's motion for new trial and supporting affidavit presented
no evidence suggesting LaRue did not knowingly and voluntarily waive his right to a jury
trial. The trial court did not abuse its discretion in failing to hold a hearing on LaRue's
motion for new trial. For the reasons discussed above, the denial of the motion for new trial
likewise was not an abuse of discretion. LaRue's third issue is overruled.

 LaRue complains in his fourth issue that the trial court erred in admitting into
evidence statements he allegedly made to Raymond Gross when they were incarcerated
together. During trial, LaRue objected when the State began questioning Gross about the
content of conversations between Gross and LaRue. LaRue requested Gross's testimony be
suppressed on the basis that Gross was acting as an agent for the State while obtaining the
information. The trial court overruled the objection. 

 LaRue claims the State's introduction of Gross's testimony violated his constitutional
rights because the State utilized Gross as an agent to improperly interrogate LaRue. He
contends the trial court failed to hold a hearing on the matter before allowing Gross's
testimony. LaRue also specifically argues that his Fifth, Sixth, and Fourteenth Amendment
rights were violated because Gross, acting as an agent for the State, questioned him without
first giving him the required statutory warnings. 

 In addressing LaRue's constitutional issues, we apply the bifurcated standard of
review stated in Guzman v. State, 955 S.W.2d 85 (Tex. Crim. App. 1997). See generally
Manns v. State, 122 S.W.3d 171, 178 (Tex. Crim. App. 2003). When the trial court's
findings are based on an evaluation of credibility and demeanor, a reviewing court should
afford "almost total deference" to a trial court's determination of the historical facts and to
its determination of mixed questions of law and fact. Id. at 89. Mixed questions of law and
fact that do not turn on credibility and demeanor are to be reviewed de novo. Id.

 The State cannot deliberately elicit incriminating statements from an accused after
indictment and in the absence of counsel, absent an express waiver of the right to counsel. 
See Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); 
Dotson v. State, 146 S.W.3d 285, 296 (Tex. App.--Fort Worth 2004, pet. ref'd). In order to
establish a violation of the Sixth Amendment right to counsel under Massiah and its progeny,
the defendant must prove the challenged statements were deliberately elicited by a
government agent. Dotson, 146 S.W.3d at 296 (citing State v. Hernandez, 842 S.W.2d 306,
312 (Tex. App.--San Antonio 1992, pet. ref'd)). The determination of whether a jailhouse
informant is acting as a state agent depends in part on whether the inmate is acting pursuant
to an agreement with or instructions from government officials. See Manns v. State, 122
S.W.3d 171, 178-89 (Tex. Crim. App. 2003). "A jailhouse informant who has not entered
into any agreement with the government and who reports incriminating evidence out of
conscience or even an 'encouraged hope to curry favor' is not acting as a government agent." 
Dotson, 146 S.W.3d at 296 (quoting Hernandez, 842 S.W.2d at 314.). LaRue has the burden
of proving Gross acted as an agent of the State. See Wilkerson v. State, 173 S.W.3d 521, 529
(Tex. Crim. App. 2005).

 Gross testified he gained information from LaRue in prison over a period of several
weeks. Gross stated that during this period of time he was never under the control or
direction of the State. He initiated contact with the district attorney's office by sending
several letters regarding information gleaned from LaRue. Prior to Gross's giving his formal
written statement to Detective Jim Walters, Gross had no direct contact with any agency or
individual representing law enforcement other than through the correspondence Gross sent. 
Gross also stated he did not request any benefit from the State in exchange for information
he obtained from LaRue, nor did the State promise him any benefit for providing such
information. 

 Although Gross ultimately gave a formal written statement, no evidence on this record
establishes the State directed or even encouraged the solicitation of LaRue's incriminating
statements. Viewed with the proper deference to the trial court's ruling, the evidence in this
case does not give rise to an agency relationship. Because LaRue has not established Gross
was acting as a state agent, Gross's conversations with LaRue do not constitute custodial
interrogation triggering Fifth, Sixth, and Fourteenth Amendment protections. The trial court
did not err in overruling LaRue's objections to Gross's testimony. Issue four is overruled.

 LaRue's fifth issue asserts that the admission of oral statements he made to
investigators violates article 38.22 of the Texas Code of Criminal Procedure. See Tex.
Code Crim. Proc. Ann. art. 38.22 (Vernon 2005). Article 38.22, section 3(a)(1), provides
that an oral statement of an accused made as a result of custodial interrogations is not
admissible unless, among other things, it is electronically recorded. Id. art. 38.22, § 3(a)(1).

 During the State's cross-examination of LaRue at trial, LaRue admitted he gave many
statements to law enforcement regarding Pentecost's murder. The State began cross-examining LaRue as to discrepancies between his statements. To demonstrate the difference
between LaRue's 1993 statement and a prior statement, the State offered into evidence an
unsigned 1993 statement made by LaRue to District Attorney Investigator Tim Smith. Based
on section 3 of article 38.22, LaRue objected to the admission of the 1993 unsigned
statement. The trial court overruled the objection. At trial and on appeal, the State contends
the statement, though not electronically recorded, is admissible pursuant to article 38.22,
section 5, because the statement goes to LaRue's credibility. Section 5 states that "[n]othing
in . . . article [38.22] precludes the admission . . . of a voluntary statement, whether or not the
result of custodial interrogation, that has a bearing upon the credibility of the accused as a
witness. . . ." Id. art. 38.22, § 5. 

 On appeal, LaRue does not challenge the voluntariness of the statement at issue.
Because the State used the statement to show the discrepancies between the statement and
previous statements for impeachment purposes, the admission of the voluntary statement
during custodial interrogation had a bearing on LaRue's credibility. The trial court properly
admitted the statement over LaRue's objection. Issue five is overruled. The judgment of 
conviction is affirmed.

 AFFIRMED.

 
 __________________________________

 CHARLES KREGER

 Justice


Submitted on March 9, 2007

Opinion Delivered May 23, 2007

Do not publish


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. The indictment charged LaRue with additional, alternative theories of capital
murder and felony murder.