COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| BRIAN ENGLETON, | § | No. 08-13-00077-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | |
| | § | 120th District Court |
| THE STATE OF TEXAS, | § | |
| | § | of El Paso County, Texas |
| Appellee. | § | |
| | § | (TC#20110D03822) |
| | § | |

## **O P I N I O N**

Appellant Brian Engleton was convicted of murdering his wife, Deidra Engleton, and sentenced to life in prison. On appeal, Engleton contends the trial court erred in refusing to suppress the recorded custodial statement he gave to the police and an oral statement he gave to the media as he was being led to the county jail for booking. Engleton also asserts the evidence is insufficient to show he was the person responsible for his wife's murder. We affirm.

### FACTUAL BACKGROUND

Deidra Engleton was murdered on the morning of June 16, 2011. That morning Deidra's sister was speaking to Deidra on the telephone when she heard Brian Engleton's voice in the background telling Deidra to get in the car and Deidra responding, "I'm not going anywhere with

you." She then heard Deidra telling Engleton to give her cell phone back, sounds of a scuffle, and then the call was disconnected. She tried to call Deidra back twice, but the calls went to voicemail. About this same time, Demetrius Blakley was leaving his nearby apartment, when he heard a woman screaming. As he was driving away from his apartment, he again heard screaming. Blakley saw a woman lying on the ground on her stomach and a man, whom he identified as Engleton, standing over her. Blakley stopped the car, got out, and asked Engleton if everything was okay; Engleton responded "Excuse me?" with his hands raised. Blakley saw Engleton was holding a bloody knife in his hand. Engleton then immediately left the scene in a white car that was parked nearby. Blakley ran over to the woman, but she was non-responsive and "full of blood." Blakley admitted at trial that he did not actually see Engleton stab Deidra, and that his observation of the incident lasted only 21 seconds.

Blakley tried to call the police using his cell phone, but could not unlock the phone because he was shaking so badly; instead he drove to a nearby police station. There, Blakley reported the attack to Officer Heriberto Limas. Officer Limas testified that Blakley walked into the station and told him: "You need to come with me. He stabbed her. He's standing over her with a bloody knife."

Officer Mario Yanez responded to the call regarding the stabbing, and immediately went to the crime scene, arriving within a few minutes after the incident. He observed Deidra lying face down, unconscious, in a large pool of blood. She had no pulse. Deidra had suffered 32 stab wounds from a knife, and eventually died from her wounds. The knife was found underneath Deidra's hands. DNA testing determined that Deidra's blood was on the knife. The medical examiner testified that the knife, which had a black handle, could have caused Deidra's injuries.

2

The medical examiner also testified that the person who attacked Deidra likely had Deidra's blood on him. DNA testing determined that a blood stain found on Engleton's right shoe was Deidra's blood.

Officer Yanez used the information on Deidra's driver's license to identify her vehicle as a white Hyundai Sonata with license plate number HPF-340. Yanez also identified the vehicle Engleton drove as a 2008 Jeep Grand Cherokee, which was found still parked across the street from the murder scene. The next day, Deidra's white Hyundai Sonata was discovered in a truck stop parking lot. Another license plate, number FJX-255, had been attached to the rear of Deidra's vehicle. The evidence showed that the plates had been switched with those of another vehicle that had been parked only a few minutes' drive from the murder scene.

A redacted version of Engleton's custodial interview was played to the jury. During his custodial interview, Engleton stated that Deidra was having an affair with a military man named "Moe," and that he wanted to report the affair to the military so that Moe would be terminated. Engleton admitted that on the day of the murder, he had gone to see Deidra to convince her to take him to see Moe. He admitted that they fought and struggled when he attempted to take Deidra's cell phone away from her because he believed it contained Moe's telephone number. Engleton also admitted that the knife found by the police was a kitchen knife with a black handle that he kept in his Jeep with his tools. Engleton had a key to Deidra's car, and he left the scene in her car. He drove around for hours. When asked why, Engleton stated, "I realized what I did...." Engleton left the car at the truck stop where he spent the night. Engleton said he had no money and could not work because Deidra had kicked him out of the house where his business was. Engleton stated, "[W]hat else could I do? … [S]he perpetrated all of this stuff using the law. … I got pushed

3

up against the wall." When asked whether he had stabbed Deidra, Engleton refused to answer. When asked whether he thought it was right that Deidra had been stabbed multiple times in the neck, Engleton asked to end the interview, and the interview was terminated.

After his custodial interview, Engleton was transported to the county jail, where he was questioned by the news media as he was being escorted to the jail entrance. The trial court admitted a redacted video of Engleton's statement to the news media, in which Engleton stated:

> I just want to say, her mom, her sister, her friend, Carol, the guy she was having an affair with, all of them are responsible for this. They sat around and did nothing, and let her perpetrate things against me, so.

## DISCUSSION

### Engleton's Custodial Statement to the Police

At trial, Engleton sought to suppress the recording of his custodial interview with the police. In his first two issues, Engleton contends the trial court erred in denying his motion to suppress because he had previously invoked his rights to counsel and to contact his consulate and his subsequent waiver of those rights was not voluntary, thereby prohibiting admission of his custodial statement under Article 38.22 of the Code of Criminal Procedure.[1] Engleton specifically contends that after invoking his rights he was never allowed to contact an attorney or his consulate, and that therefore, even though he then initiated further communication with the police, his subsequent waiver of his rights could not be considered voluntary.

*Factual and Procedural Background*

---

[1] Article 38.22 establishes procedural safeguards for securing the privilege against self-incrimination. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005). It provides that no oral statement of an accused made as a result of a custodial interrogation is admissible against the accused in a criminal proceeding unless (1) the statement was recorded, and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. *Id*. at 38.22, § 3.

4

The trial court held a *Jackson v. Denno* hearing to determine whether to suppress Engleton's custodial statement to the police. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The evidence showed that around 3:30 p.m. on June 17, 2011, the day Engleton was arrested, he met with Detectives Pete Lozano and Charles Romo at the El Paso Police Department's Crimes Against Persons Office interview room. Detective Lozano explained to Engleton that he had been arrested for murder and read Engleton his *Miranda* rights. Engleton stated he did not want to talk, but instead wanted to get representation and talk to his consulate. Detective Lozano terminated the interview and did not ask Engleton any further questions. Engleton was then placed in a holding cell at the Crimes Against Persons Office.

Shortly thereafter, Engleton flagged down Detective Michael Lara, who was using a printer near the holding cell, and told him he wished to speak to Detectives Lozano and Romo. Detective Lara testified he had not said anything or made any gestures to attract Engleton's attention. Nor had Sergeant Alfonso Cardenas, the supervisor in charge of the investigation, instructed his detectives to say or do anything to get Engleton to make a statement. Lara relayed Engleton's message to Detective Lozano that Engleton wanted to speak to him. Only about 15 minutes or a "few minutes" passed between Engleton's initial refusal to talk and his subsequent decision to tell his story to Detective Lozano. Detective Lozano confirmed with Engleton that he now wanted to speak to him, and Engleton expressed his desire to tell his side of the story.

Engleton was escorted back to the interview room, and a second interview occurred around 4 p.m. This second interview was recorded by Detective Lozano. As shown by the recording, Detective Lozano first confirmed that Engleton had initiated the second interview and that he now wanted to tell his story, and then advised Engleton of his *Miranda* rights by reading each statement

5

from the *Miranda* card. Engleton stated he understood each of his rights and was waiving those rights, and he signed, initialed, and dated the *Miranda* card, which noted that he understood and was waiving his rights. At no time did Detective Lozano threaten or coerce Engleton, place him under duress, or deny him any necessities while he was giving the statment. Engleton was cooperative at the start of the interview and became emotional during the interview, crying periodically. After Engleton had provided numerous significant details during the interview, he asked that the interview be terminated, and Detective Lozano complied, ending the interview at 4:47 p.m.

The trial court entered written findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West 2005). The trial court made numerous findings, all in conformance with the evidence presented at the suppression hearing, and concluded that Engleton had invoked his right to counsel and to speak with his consulate when he first refused to provide a statement, but that his invocation "was *not* unambiguous and unequivocal as he subsequently asked to speak with detectives." The court also concluded that Engleton was then again provided with his *Miranda* rights at the beginning of the recorded statement, including his consular rights, right to counsel, and right to remain silent, and that Engleton voluntarily, intelligently, and knowingly waived those rights by providing the statement after acknowledging his understanding of those rights.

*Standard of Review*

A trial court's ruling at a suppression hearing is reviewed for an abuse of discretion. *Ramos v. State,* 245 S.W.3d 410, 417-18 (Tex.Crim.App. 2008). In reviewing the trial court's decision, an appellate court must view the evidence in the light most favorable to the

6

trial court's ruling. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). We afford almost total deference to a trial court's determination of historical facts. *See Montanez v. State,* 195 S.W.3d 101, 109 (Tex.Crim.App. 2006). We afford the same deference to the trial court's resolution of mixed questions of law and fact that turn on an evaluation of credibility and demeanor, and review *de novo* only the court's resolution of mixed questions not falling within this category. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos,* 245 S.W.3d at 418. A determination whether a confession was voluntarily rendered is analyzed by examining the totality of the circumstances. *Arizona v. Fulminante,* 499 U.S. 279, 285–86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *see Delao v. State*, 235 S.W.3d 235, 239 (Tex.Crim.App. 2007), *cert denied*, 552 U.S. 1168 (2008).

*Analysis*

Engleton recognizes that even after an accused has invoked his right to counsel, a custodial interrogation can resume if the accused initiates further communication with the police.[2] He contends, however, that after he invoked his rights to counsel and to contact his consulate, his request "was essentially ignored." He notes that Detective Lozano immediately terminated the interview and neither advised him that he would be given the opportunity to speak with an attorney, nor provided him with the means to contact an attorney or his consulate. Lozano simply terminated the conversation without explanation. Engleton contends he "had every reason to believe that his request was not being honored," and that under these circumstances, his request to

---

[2] Engleton also recognizes that a failure to follow the Vienna Convention, which includes the right to contact one's consulate, does not authorize suppression of a confession or statement to the police, but can only be considered as a factor in assessing the voluntariness of a custodial statement. *See Sierra v. State,* 218 S.W.3d 85, 87 (Tex.Crim.App. 2007).

7

reinstate contact with the detectives cannot be seen as a voluntary decision to waive his rights, but rather "a realization that the rights that were explained to him are meaningless and if he desires to defend himself, he must do so on his own." We conclude that Engleton's subsequent waiver of his rights was effective, voluntary, and in compliance with Article 38.22.

In *Edwards v. Arizona,* the Supreme Court held that once an accused has expressed his desire to deal with the police only through counsel, all custodial interrogation must cease unless he initiates further communication, exchanges, or conversation with the police. 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see also Cross v. State*, 144 S.W.3d 521, 523-24 (Tex.Crim.App. 2004). *Edwards* set out a bright-line rule "designed to protect an accused in police custody from being badgered by police officers[.]" *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (discussing the purpose of the *Edwards* rule). A suspect's unwillingness to answer questions without the advice of counsel indicates that he does not feel sufficiently comfortable with the pressures of custodial interrogation to respond to police inquiries without an attorney's assistance. *Cross*, 144 S.W.3d at 526; *see Arizona v. Roberson*, 486 U.S. 675, 684, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) ("Roberson's unwillingness to answer any questions without the advice of counsel, without limiting his request for counsel, indicated that he did not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney.").

But, the Supreme Court has also explicitly stated that a suspect is not "powerless to countermand his election" to speak only with the assistance of counsel. *Edwards*, 451 U.S. at 485; *Cross*, 144 S.W.3d at 526. Under *Edwards,* the "discomfort" in dealing with the police without the guiding hand of counsel is presumed to persist unless the suspect himself initiates

8

further conversation about the investigation. *Cross*, 144 S.W.3d at 526; *see Roberson*, 486 U.S. at 684. Because the *Edwards* rule was devised to prevent police from badgering a suspect into giving up his right to counsel, compliance with that rule, coupled with a suspect's initiation of further communications about the investigation, plus a voluntary waiver of his previously invoked right to counsel, fully satisfies the rule, and its protections then fall away. *Cross*, 144 S.W.3d at 524, 528.

In *Oregon v. Bradshaw,*[3] the Supreme Court established a two-step procedure to determine whether a suspect has waived his previously invoked right to counsel. 462 U.S. at 1044-45; *Cross*, 144 S.W.3d at 526-27. The first step requires proof that the suspect himself initiates further communication with the authorities after invoking the right to counsel. The second step requires proof that, after he reinitiates communication with the authorities, the suspect validly waives the right to counsel. 462 U.S. at 1045-46; *Cross*, 144 S.W.3d at 527. Once this two-step waiver requirement is shown, the suspect has countermanded his original election to speak to authorities only with the assistance of counsel, and the *Edwards* rule is fully satisfied and drops out of consideration entirely. *Cross*, 144 S.W.3d at 526-27; *see McCarthy v. State*, 65 S.W.3d 47, 51 n.6 (Tex.Crim.App. 2001) ("Of course, if the arrestee reinitiates the conversation, the *Edwards* rule is satisfied.").

The record here is clear that all the requirements were met. There was initial compliance with the *Edwards* rule – after Engleton invoked his right to counsel and to contact his consulate,

---

[3] In *Cross*, the Court of Criminal Appeals recognized that although *Oregon v. Bradshaw* was a plurality opinion, the plurality and dissent agreed that if a suspect "initiates" further communications with the police and demonstrates a willingness and desire to discuss the subject matter of the investigation with authorities, the *Edwards* rule is satisfied. *Cross*, 144 S.W.3d at 527 n.15. The dispute between the plurality and the dissent centered only on the application of that standard to the specific facts of the case. *Id*.

the detectives immediately terminated the initial interview. There was initiation of further communication by the accused – a "few minutes" or "15 minutes" after invoking his rights, Engleton, on his own and without any prompting from the police, requested to speak to the detectives to tell his story. And, there was a voluntary waiver of the previously invoked rights – the totality of the circumstances surrounding the interrogation shows that Engleton's subsequent waiver was voluntary and resulted from a free and deliberate choice without intimidation, coercion, or deception. *See Joseph v. State*, 309 S.W.3d 20, 25 (Tex.Crim.App. 2010) (the relinquishment of the right must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception).

The recording of the interview demonstrates that Engleton waived his rights and provided the statement without threats, coercion, or promises of anything in return. The recording shows Engleton confirming that he had reinitiated contact with the detectives. It shows that immediately after being warned once again by Detective Lozano that he had the rights to remain silent, to counsel, and to contact his consulate, Engleton acknowledged he understood his rights and he was waiving those rights. Engleton then willingly participated in the interview. At no time during the interview did Engleton request an attorney or question when he could contact an attorney or his consulate pursuant to his original request. When Engleton asked that the interview be stopped, it was terminated immediately. The recording shows no evidence of intimidation or coercion or that Engleton appeared to be under duress or unduly distraught. The recording shows that the detectives did not coerce Engleton in any way and that at no time did they promise Engleton anything in exchange for giving a statement. In sum, the record shows full compliance with the

10

dictates of *Edwards v. Arizona*, *Oregon v. Bradshaw*, *Cross v. State*, and Article 38.22 for admission of the custodial statement.

An accused is already well-protected from police badgering by the existing rules, which require initial compliance with *Edwards*, a finding that the accused initiated further communications with law enforcement, plus a finding that the accused voluntarily waived his previously invoked right to counsel. We refuse Engleton's invitation to graft on any additional requirements before an accused's initiation of further communication can lead to a voluntary waiver of previously invoked rights. We also reject Engelton's contentions that the passage of 15 minutes necessarily compelled the conclusion that Engleton believed his initial requests had been ignored and that the State had the burden to disprove Engleton subjectively believed he had no choice but to waive his rights. The objective evidence shows the opposite. Engleton initiated further communications with the police on his own volition because he wanted to tell his side of the story, Engleton then affirmatively waived his rights, and not once during his statement did Engleton discuss or question if or when he could contact an attorney or his consulate pursuant to his original request. The State met its burden by presenting sufficient evidence to allow the trial court in its discretion to determine that the police properly terminated the initial interview when Engleton asserted his rights, that Engleton initiated further communications with the police, and that he then voluntarily waived his previously invoked rights. Contrary to Engleton's contentions, under the existing law and the totality of the circumstances, the State was not required to provide additional explanations or assurances to Engleton concerning his rights to counsel or to contact his consulate in order for his subsequent waiver of his rights to be considered voluntary.

We also do not place any weight on Engleton's argument that the trial court erred in concluding that his initial invocation of his rights "was *not* unambiguous and unequivocal as he subsequently asked to speak with detectives." The trial court's ruling on a motion to suppress will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos,* 245 S.W.3d at 418. Whatever the trial court meant to conclude, it properly denied the motion to suppress because the record shows full compliance with the dictates of *Edwards v. Arizona*, *Oregon v. Bradshaw*, *Cross v. State*, and Article 38.22, all of which constitute the law applicable to the case. Issues One and Two are overruled.

## Engleton's Statement to the Media

In Issue Three, Engleton contends the trial court erred in refusing to suppress his oral statement to the local media because their questions, under the circumstances, were the "functional equivalent" of a custodial interrogation. We disagree and conclude the trial court did not abuse its discretion in denying Engleton's motion to suppress his statement to the media.[4]

### *Factual and Procedural Background*

The facts surrounding Engleton's statement to the media are not in dispute. After giving his custodial statement to the police, Engleton was taken to the county jail to be booked. The detectives parked the police vehicle in front of the jail and escorted Engleton around the block to the private entrance. As Engleton was being escorted to the private entrance, the local news media questioned Engleton, and he responded to those questions. There was no police policy governing where to park at the jail, and no one at the police department suggested where to park so as to allow media access to Engleton. The trial court denied Engleton's motion to suppress and

---

[4] We apply the same standard of review as we applied in reviewing the trial court's refusal to suppress Engleton's custodial statement to the police.

12

admitted into evidence a redacted video of Engleton's statement, concluding that Engleton's statement to the media was not the product of custodial interrogation by any law enforcement agency.

*Analysis*

Engleton contends the detectives had the option to park their vehicle at the private entrance to the county jail so that the media would not have access to question him and that the detectives should have known that allowing media access was reasonably likely to elicit an incriminating response from him. He argues the questions from the media were therefore "the functional equivalent" of a custodial interrogation, and his statement was admitted in violation of Article 38.22. Engleton concedes that Article 38.22 does not preclude the admission "of a statement that does not stem from custodial interrogation[.]" TEX. CODE CRIM. PROC. ANN. art. 38.22, § 5 (West 2005). But, Engleton argues that allowing the media to question him "was the functional equivalent of interrogation by the police much like allowing a third party into the interrogation room to pose questions to a suspect." *Cf. Escamilla v. State*, 143 S.W.3d 814, 824 (Tex.Crim.App. 2004), *cert. denied*, 544 U.S. 950 (2005) (discussing the typical state agent "scenario where the police employ an informant to deliberately elicit incriminating statements from an in-custody defendant solely for the purpose of helping the police gather evidence against the defendant"). The State contends that because there was no evidence the media were acting as state agents in posing their questions, Engleton's statement was admissible because it was not the product of a custodial interrogation. We agree with the State.

"Custodial interrogation" under Article 38.22 means "*questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his

13

freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis added); *see Bass v. State*, 723 S.W.2d 687, 690-91 (Tex.Crim.App. 1986) ("custodial interrogation" as used in Article 38.22 was intended to be construed consistently with its meaning under the Fifth Amendment of the United States Constitution). Article 38.22 does not apply to statements given to non-law enforcement personnel unless they are acting as state agents. *Paez v. State*, 681 S.W.2d 34, 36-37 (Tex.Crim.App. 1984).

Non-law enforcement personnel are acting as state agents only when an agreement exists between them and law enforcement at the time of the elicitation of the statement. *Broadnax v. State*, No. AP-76207, 2011 WL 6225399, at *10 (Tex.Crim.App. Dec. 14, 2011) (not designated for publication), *cert. denied*, 133 S.Ct. 103 (2012); *Escamilla*, 143 S.W.3d at 824. This state-agent requirement has been applied to the media: reporters must be acting under an agreement with law enforcement before their questioning can be considered a custodial interrogation and the accused's statements are subject to Article 38.22's requirements for admissibility. *See Broadnax*, 2011 WL 6225399, at *10 (trial court did not err in admitting defendant's numerous interviews with television news reporters because there was no evidence of any agreement between the reporters and law enforcement); *Escamilla*, 143 S.W.3d at 824 (television reporter who interviewed defendant in jail was not a state agent because there was no evidence of an agreement between the reporter and law enforcement at the time); *Brown v. State*, No. 03-95-00513-CR, 1996 WL 530010, at *3 (Tex.App. – Austin Sept. 18, 1996, no pet.) (Article 38.22 did not apply because it "applies only to statements obtained as a result of custodial interrogation," and the "reporter was not shown to be acting as an agent of the police").

14

There is no evidence here that the media were acting as state agents under an agreement with law enforcement at the time they posed their questions to Engleton as he was being escorted to jail. Thus, the trial court properly concluded that Engleton's statement to the media was not the product of a custodial interrogation and was admissible.

Engleton's "functional equivalent" argument fails because it is not based on evidence of any agreement or collusion between the media and law enforcement; rather it is based solely on the grounds that the detectives could have parked so as to prevent media access and allegedly should have known that Engleton would respond to the media's questions. This, however, is insufficient to transform the media into state agents.

A comparison with other cases is instructive in this regard. In *Escamilla*, the evidence showed that the police permitted the reporter to interview the defendant in jail after the defendant had consented to the interview in response to the reporter's request. 143 S.W.3d at 822. The defendant claimed the reporter became a state agent when, after the defendant had consented to the interview but before the interview took place, a police officer called the reporter and, in an effort to reassure the reporter he did not intend to block the interview, explained to the reporter "I want you to get him to talk" because "[h]e won't talk to me." *Id*. at 822-23. The Court of Criminal Appeals held that the officer's statement did not constitute an offer for the reporter to act as a state agent, and thus the defendant's statement to the reporter was not the product of a custodial interrogation. *Id*. at 824. Likewise, in *State v. Hernandez*, a sheriff at the jail passed a note from the reporter to the defendant with the reporter's phone number and a request for a television interview, and the defendant called the reporter and made incriminating statements. 842 S.W.2d 306, 309-10 (Tex.App. – San Antonio 1992, pet. ref'd). Despite the sheriff's facilitation of the

15

interview, the reporter was held not to be an agent of the State. *Id*. at 315-16. Undermining Engleton's argument is that the conduct in both *Escamilla* and *Hernandez* was more suspect than that of law enforcement in the present case, where there is no evidence of any contact or facilitation between the police and the media, and yet the conduct in both *Escamilla* and *Hernandez* was deemed not to have risen to the level of state agency. Issue Three is overruled.

## Sufficiency of the Evidence

In Issue Four, Engleton contends the evidence was insufficient to prove that he was responsible for Deidra's murder. Engleton concedes there is evidence that he was present with Deidra at or near the time she died, but argues there is no evidence that he was the person who killed Deidra. We disagree. We conclude the evidence was sufficient to allow the jury to make the reasonable inference that Engleton was the person who stabbed and murdered Deidra.

### *Standard of Review*

In a legal sufficiency review, we consider all the evidence in the light most favorable to the verdict, and the reasonable inferences that flow from it, to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App. 2010). "If, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004).

In performing our sufficiency review, we do not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Dewberry v. State*, 4 S.W.3d

16

735, 740 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1131 (2000). We presume the fact finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007). We determine only whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex.Crim.App. 2007). Each fact is not required to point directly and independently to the guilt of the accused, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id*. at 13 (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993)). Circumstantial evidence alone can be sufficient to establish guilt. *Guevara,* 152 S.W.3d at 49.

*Analysis*

Identification of the defendant as the person who committed the offense charged is an element of the offense the State must prove beyond a reasonable doubt. *Rushing v. State*, No. 08-05-00365-CR, 2007 WL 2405797, at *3 (Tex.App. – El Paso Aug. 23, 2007, pet. ref'd) (not designated for publication) (citing *Miller v. State*, 667 S.W.2d 773, 775 (Tex.Crim.App. 1984)); *see McCullen v. State*, 372 S.W.2d 693, 695 (Tex.Crim.App. 1963) (the burden is on the State in any criminal prosecution to prove beyond a reasonable doubt that the accused committed the criminal act charged). The identity of a perpetrator may be proven by either direct or circumstantial evidence. *Tilford v. State*, No. 08-09-00154-CR, 2011 WL 3273543, at *2 (Tex.App.–El Paso July 29, 2011, pet. ref'd) (not designated for publication); *Rushing*, 2007 WL 2405797, at *3.

17

Engleton concedes the State's evidence clearly placed him with Deidra at or near the time of her death, but argues the State failed to directly prove that he was the person who killed her. In particular, Engleton argues that while the eyewitness Blakley saw him standing over or near Deidra's bleeding body with a bloody knife in his hand, Blakley admitted that he did not actually see Engleton stab Deidra. Further, Blakley did not testify he saw Engleton discard the knife, and the evidence showed the knife was found underneath Deidra's body. Moreover, Engleton points out that in his custodial statement and in his statement to the media, he never admitted to stabbing Deidra. Engleton argues that his mere presence at the scene was not enough to prove guilt and that there was insufficient evidence from which the jury could infer that he was the person who killed Deidra with a knife. We disagree and conclude there was more than sufficient evidence from which the jury could reasonably infer that Engleton was the person who stabbed and murdered Deidra.

While mere presence at the scene itself is not enough to sustain a conviction, the jury may consider that fact in determining whether the defendant committed the offense. *See Mohamad v. State*, No. 01-09-00383-CR, 2010 WL 2874150, at *3 (Tex.App. – Houston [1st Dist.] July 22, 2010, pet. ref'd) (mem. op.) (not designated for publication). Further, there was strong circumstantial evidence, beyond evidence of Engleton's mere presence at the scene, that Engleton was the person who murdered Deidra. Deidra's sister, while on the phone with Deidra, heard Engleton's voice in the background, heard Deidra tell Engleton to return her cell phone to her, heard the sounds of a scuffle, and then the call was then disconnected. Her subsequent attempts to reach Deidra were unsuccessful. At the same time, Blakley heard screaming, and seconds later saw Deidra lying on the ground with Engleton standing over her holding a bloody knife. From

18

this evidence alone, the jury could have reasonably inferred that Engleton was the person who stabbed Deidra. *See Evans v. State*, No. 01-09-00974-CR, 2011 WL 346430, at *2-3 (Tex.App.–Houston [1st Dist.] Feb. 3, 2011, no pet.) (mem. op.) (not designated for publication) (evidence was legally sufficient to establish defendant as the murderer where the eyewitness saw the defendant and the victim together at the time he heard gunshots, even though the eyewitness never saw the defendant with a gun).

There was also additional circumstantial evidence of Engleton's guilt. Engleton was the last person to see Deidra alive, he had the opportunity to commit the crime, he had access to the type of weapon used to stab Deidra – a kitchen knife with a black handle that Engleton kept in his Jeep, and Deidra's blood was found on his shoe. *See Tilford*, 2011 WL 3273543, at *5-6 (explaining that the opportunity to the commit the crime, the fact that the defendant was seen with the victim and was the last person to see the victim alive, and that the defendant's access to the type of weapon used to kill the victim, in addition to other facts, were circumstances establishing defendant's guilt). Moreover, after Engleton was seen standing over Deidra's body holding a bloody knife, he immediately left the scene in Deidra's car without calling for help. A defendant's failure to call 911 or to notify anyone of the victim's condition is circumstantial evidence of guilt. *See Clayton*, 235 S.W.3d at 780-81.

Further, Engleton had motive to commit the crime. Engleton explained in his custodial interview that he blamed Deidra for having an affair, for perpetrating "all of this stuff using the law," that he "got pushed up against the wall," and ultimately stated "what else could I do?" S*ee Clayton*, 235 S.W.3d at 781 (motive "may be a circumstance that is indicative of guilt"); *Evans*, 2011 WL 346430, at *3; *Reeves v. State*, 969 S.W.2d 471, 479 (Tex.App. – Waco 1998, pet. ref'd)

19

(a rational jury could find beyond a reasonable doubt that the defendant killed victim despite uncertainty in the means used or the precise cause of death because the defendant had the best opportunity and motive for killing her since he was jealous of victim's other intimate relationships).

Also, when confronted by Blakley, Engleton immediately left the scene in Deidra's white Hyundai, and not in his own Jeep Cherokee, which was parked nearby. Further, the license plates on Deidra's car were switched out with the plates of another vehicle that was parked nearby the murder scene. Engleton's flight from the scene and the switching of license plates demonstrated a consciousness of guilt that provides additional circumstantial evidence from which the jury could infer that Engleton murdered Deidra. *Castaneda v. State*, No. 08-10-00050-CR, 2011 WL 4490960, at \*5 (Tex.App. – El Paso Sept. 28, 2011, pet. ref'd) (not designated for publication) (any conduct on the part of a person accused of a crime subsequent to its commission that indicates a consciousness of guilt may tend to prove that he committed the act with which he is charged); *Martin v. State*, 151 S.W.3d 236, 245 n.8 (Tex.App. – Texarkana 2004, pet. ref'd) (defendant's consciousness of guilt shown by his flight from the scene); s*ee also Clayton*, 235 S.W.3d at 780 ("a factfinder may draw an inference of guilt from the circumstance of flight"); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex.Crim.App. 1994), *cert. denied*, 515 U.S. 1162 (1995) (same); *Evans*, 2011 WL 346430, at \*3 (same). Finally, as the State points out, the most damning consciousness-of-guilt evidence came from Engleton himself when he admitted in his custodial interview that he struggled with Deidra for her phone, then left the scene and drove around in Deidra's car for hours because "I realized what I did...." *Clayton*, 235 S.W.3d at 780; *Evans*, 2011 WL 346430, at \*3; *Castaneda*, 2011 WL 4490960, at \*5.

Engleton's identity as the killer could be established through either direct or circumstantial evidence. *Tilford*, 2011 WL 3273543, at \*2; *Rushing*, 2007 WL 2405797, at \*3. Further, each fact was not required to point directly and independently to Engleton's guilt, as long as the cumulative force of all the incriminating circumstances was sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Given the cumulative force of Blakley's testimony that immediately after hearing screams he saw Engleton standing over Deidra's body with a bloody knife, the testimony that Deidra's sister heard Engleton scuffling with Deidra over the phone, Engleton's knowledge of and access to the knife, his anger at Deidra over the extra-marital affair, Engleton's statement that he realized what he did, and evidence that Engleton fled the scene in Deidra's car with switched license plates, it was rational for the jury to infer that Engleton was the person who stabbed Deidra to death. Viewing all the evidence in the light most favorable to the verdict, we conclude the jury could have found beyond a reasonable doubt that Engleton was the person who murdered Deidra. Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


                                        STEVEN L. HUGHES, Justice

March 20, 2015

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

21